Leon GREEN, on behalf of himself and
all others similarly situated,
Appellant,

v.

WOLF CORPORATION, Joseph Wolf,
Joseph Eckhaus, Leon Spilky, David
Berdon & Co., and Troster, Singer and
Co., Appellees.

No. 82, Docket 32335.

United States Court of Appeals
Second Circuit.

Argued Oct. 28, 1968.

Decided Dec. 9, 1968.

Irving Malchman, New York City (Malchman & Klied, New York City, on the brief), for appellant.

George F. Adams, New York City (F. W. H. Adams, Satterlee, Warfield & Stephens, New York City, on the brief), for appellee, Troster, Singer & Co.

Milton E. Mermelstein, New York City (Jay D. Fischer, Mermelstein, Burns & Lesser, New York City, on the brief), for appellees, Wolf Corp., Joseph Wolf, Joseph Eckhaus and Leon Spilky.

Gerald D. Fischer, New York City (Stroock, Stroock & Lavan, New York City, on the brief), for appellee, David Berdon & Co.

Before LUMBARD, Chief Judge, and KAUFMAN and HAYS, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

We are called upon to decide two significant questions relating to § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5: Under what circumstances does Fed.R. Civ.P. 23 permit a class action alleging a violation of 10b–5? And, may punitive damages be assessed against those who do not meet the standards of conduct required by that rule?

Leon Green appeals from an order of the District Court for the Southern District of New York striking those parts of his complaint which purported to make the suit a class action and those other allegations which sought punitive damages. We believe that this litigation has been properly brought as a class action but that the District Court should not reinstate Green's claim for punitive damages.

## I–Facts [1]

The Wolf Corporation was organized in January, 1961 by three real estate investors, Joseph Wolf, Joseph Eckhaus, and Leon Spilky [2] who exchanged certain real estate holdings for $775,000 of the corporation's subordinated debentures. Wolf Corp. [hereinafter Wolf] then filed a registration statement and prospectus [the first prospectus] with the Securities and Exchange Commission in February 1961, to become effective on June 2, 1961, in connection with the issuance of 806,350 shares of Class A common stock and $3,583,000 in fifteen year, 7.2% subordinated debentures. 746,350 shares of the stock and $2,808,000 of the debentures were to be exchanged for the interests of various limited partners in certain real estate syndicates of which Messrs. Wolf, Eckhaus and Spilky were the general partners. The other 60,000 shares of Class A common stock were offered to the public at $10 a share, conditioned on consummation of the "exchange" offer with the limited partners. This registration was approved by the SEC and the stock in question was sold to the public.

On January 26, 1962, Wolf filed a second registration with the SEC, accompanied by a prospectus [the second prospectus]. These documents related to a proposed issue of $4,500,000 of 6.5% convertible subordinated debentures with detachable warrants to purchase 450,000 shares of Class A common stock. This second registration was amended in June 1962 to cover the issuance of a different combination of securities: $1,321,500 in 6½% convertible subordinated debentures and 264,300 shares of Class A common. Another prospectus [the third prospectus] was prepared in connection with this amended second registration. The third prospectus was subscribed "Underwriter Troster, Singer & Co." [hereinafter Troster, Singer].

The second prospectus noted that this was Troster, Singer's first venture as an underwriter. Troster, Singer is a defendant in this action, and Green concedes that its liability, if any, is only to those who purchased Wolf stock after June 1, 1962, the date of the third prospectus.

The SEC began an investigation of Wolf on July 13, 1962. This was grounded on allegedly untruthful statements in the second registration statement, including alleged inaccuracies in the cash Wolf claimed was available for distribution to stockholders. By a decision and order dated May 4, 1966, the SEC found "serious and extensive" deficiencies in the second registration statement, as amended in June 1962, but nonetheless consented to Wolf's offer to withdraw the registration and the second and third prospectuses accompanying it. As a condition to the SEC's consent it required Wolf to notify its stockholders and all those who had received the prospectuses of what the Commission characterized as "the dismal record of the abortive financial program and the deceptive financial presentation of the registrant's earlier record of operations." Wolf Corp. No. 4830 at 11 (SEC, May 4, 1966). Thus the second registration never became effective and no stock was sold pursuant to it.

Green began his association with Wolf by purchasing a limited partnership in one of the real estate syndicates covered by the "exchange offer" for the sum of $3,500. On June 2, 1961 he surrendered this interest for 350 shares of Wolf Corp. stock and $777 in subordinated debentures. On June 13, 1962, shortly after the third prospectus was issued, Green purchased 100 shares of Wolf stock in the open market at a price of $10¼ a share for a total price of $1,042.27 (including commissions). The purchase of these shares, he acknowl-

1. We have assumed for the purpose of this appeal, as we are required to do, that the "facts" stated in the complaint and accompanying papers submitted to Judge Ryan are true. No such finding, of course, is to be inferred.

2. All are defendants in this action.

edges in his brief,[3] is the sole basis for his suit. All 100 shares were still in his possession when this action was commenced.

We are presented with the difficult task of interpreting the class action rule, Fed.R.Civ.P. 23 [hereinafter Rule 23], because Green seeks to bring this action on behalf of all those who purchased the common stock or subordinated debentures of Wolf Corp. between June 2, 1961 and the end of 1963, a group consisting of about 2,200 persons. It is conceded that no other purchaser has brought an action arising from the alleged acts which were committed approximately six years ago. Nor has any shareholder sought to intervene in this suit.

Green asserts that the three prospectuses, which together are alleged to be the sum of information disclosed by Wolf to the general public and to the financial community during the period in question, contain untrue or misleading statements. In particular, he claims that the item "Cash Available for Distribution to Shareholders" in the balance sheet incorporated in each prospectus was overstated. Green claims that this item is of great significance to potential buyers of shares in a real estate corporation, for it is said to be the key to what the likely return may be on this type of investment. Thus, he argues that the more cash the balance sheet reflects as available for distribution, the higher the potential price of the stock is expected to reach, and hence the greater the inflation of the cash available item, the more

significant the impact on the price of the stock. These serious misrepresentations and omissions, Green alleges, artificially inflated the price of Wolf stock.[4] The complaint alleges that Green (and presumably members of the class he seeks to represent), relied on the misstatements and omissions in that none were aware the price of the stock had been inflated to an artificially high level by the misleading information. All of this, it is claimed, violates § 10(b) and Rule 10b–5 [hereinafter 10b–5]. For himself, Green seeks to recover the difference between the price he paid, $10¼, and the "true" or unmanipulated value of Wolf stock, which he puts at between $1 and $2½; the total damage to Green is thus less than $1,000.[5]

## II—CLASS ACTIONS

■■ We are mindful that the serious and troublesome question as to when to allow a class action under 10b–5 [6] is one of great importance. This is so because "[t]he ultimate effectiveness of the federal remedies when the defendants are not prone to settle may depend in large measure on the applicability of the class action device." 3 Loss, Securities Regulation 1819 (2d ed. 1961). While other federal securities antifraud provisions are important none have become as far-reaching as Rule 10b–5 which, although little used in its early years, now represents approximately one-third of all current cases, public and private, brought under the whole array of SEC statutes. It generates almost as much litigation as

---

3. In the court below, Green relied in part on stock he received in the "exchange offer." He sold 200 shares of this stock on June 22, 1962 at a price of $10 per share and 125 shares on December 16, 1965 at a price of $1½.

4. Green asserts that although the second and third prospectuses were never available to the general public, they were distributed widely in the financial community, which functions as the "eyes and ears" of the public in creating a demand for particular stocks.

5. The particular misstatements on which Green bases his suit are discussed infra at 299–300.

6. We note that the order striking the class action aspects of the complaint is appealable at this time, since if a class action is not permitted the litigation will very likely terminate without reaching the merits. Eisen v. Carlisle & Jacquelin, 370 F.2d 119 (2d Cir. 1966) (Eisen I), cert. denied 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598. Green obviously does not intend to press what will probably be an enormously complex and expensive action to recover less than $1,000.

all the other general antifraud provisions combined. Bromberg, Securities Law: Fraud: SEC Rule 10b–5, § 2.5(6) at 45–46 (1968); 77 Yale L.J. 1585 (1968). If, as here, the security in connection with which the alleged misrepresentations and violations of 10b–5 have been made is publicly held, a class action may well be the appropriate means for expeditious litigation of the issues, because a large number of individuals may have been injured, although no one person may have been damaged to a degree which would have induced him to institute litigation solely on his own behalf.[7]

## A. Development of Rule 23

The ontogeny of Rule 23,[8] which became operative July 1, 1966, illustrates

---

7. "The type of injury which tends to affect simultaneously the interest of many people is also apt to involve immensely complex facts and intricate law, and redress for it is likely to involve expense totally disproportionate to any of the individual claims." Kalven & Rosenfield, The Contemporary Function of the Class Suit, 8 U.Chi.L.Rev. 684 (1941). See Escott v. Barchris Const. Corp., 340 F.2d 731, 733 (2d Cir. 1965), cert. denied 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1966).

8. The text of Rule 23 reads:
CLASS ACTIONS
(a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
(b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
(1) the prosecution of separate actions by or against individual members of the class would create a risk of
(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.
(c) *Determination by Order Whether Class Action to be Maintained; Notice; Judgment; Actions Conducted Partially as Class Actions.*
(1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.
(2) In any class action maintained under subdivision (b) (3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel.
(3) The judgment in an action maintained as a class action under subdivision (b) (1) or (b) (2), whether or not favorable to the class, shall include and describe those whom the court finds to be members of the class. The judgment in an action maintained as a class action under subdi-

the need for an effective use of class actions in securities act litigation. See generally Cohn, The New Federal Rules of Civil Procedure, 54 Geo.L.J. 1204, 1213–26 (1966); Frankel, Some Preliminary Observations Concerning Civil Rule 23, 43 F.R.D. 39 (1968); Kaplan, Continuing Work of the Civil Committee: 1966 Amendments to the Federal Rules of Civil Procedure (I), 81 Harv. L.Rev. 356, 375–400 (1968). Equity has long recognized that there is need for a course which would redress wrongs otherwise unremediable because the individual claims involved were too small, or the claimants too widely dispersed. Moreover, early in the development of our civil procedures it became apparent that judicial efficiency demanded the elimination of multiple suits arising from the same facts and questions of law. Hence, the wise and necessary procedure was created by which a few representatives of a class could sue on behalf of others similarly situated, and be granted a judgment that would bind all.[9] See e. g. Smith v. Swormstedt, 57 U.S. (16 How.) 288, 14 L.Ed. 942 (1853) (6 plaintiffs representing 1500 preachers of the southern sector of the Methodist Episcopal Church against three defendants representing 3800 ministers of the northern sector, after the church split over the slavery issue).

Unfortunately, the class action device became overencumbered and entangled. The old Federal Rule of Civil Procedure 23, effective from 1938 to 1966, sought to separate class actions into a trichotomy known as "true," "hybrid," and "spurious," depending upon the character of the litigation. The courts gave each division a varying degree of effect in binding the class by the judgment, with the spurious class action binding only those members of the class actually before the court. The system proved to be ill-devised. See Kaplan, supra (81 Harv.L.Rev.), at 380–86; Keefe, Levy, Donovan, Lee Defeats Ben-Hur, 33 Corn.L.Q. 327, 334 (1968) (describing the attitude of the old rule as "unthinking formalism"). Spurious class actions thus failed to fulfill one of the principal reasons for the existence of class suits—to improve judicial efficien-

vision (b) (3), whether or not favorable to the class, shall include and specify or describe those to whom the notice provided in subdivision (c) (2) was directed, and who have not requested exclusion, and whom the court finds to be members of the class.

(4) When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly.

(d) *Orders in Conduct of Actions.* In the conduct of actions to which this rule applies, the court may make appropriate orders; (1) determining the course of proceedings or prescribing measures to prevent undue repetition or complication in the presentation of evidence or argument; (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; (3) imposing conditions on the representative parties or on intervenors; (4) requiring that the pleadings be amended to eliminate therefrom allegations as to representation of absent persons, and that the action proceed accordingly; (5) dealing with similar procedural matters. The orders may be combined with an order under Rule 16, and may be altered or amended as may be desirable from time to time.

(e) *Dismissal or Compromise.* A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs. As amended Feb. 28, 1966, eff. July 1, 1966.

9. The traditional concept was simply stated in the ancient Federal Equity Rule 38. "When the question is one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court, one or more may sue or defend for the whole." 226 U.S. 659 (1912).

cy by reducing the number of suits that might arise from a single wrong to many individuals. Thus, one of the important changes introduced by the present Rule 23 was to make the judgment in a class action binding upon all members of the class, whether they appear in the action or not, unless a member affirmatively "opts out" of the litigation at the onset. Rule 23(c) (2) (B). Because of the conclusiveness of a class judgment, it follows that a court must carefully examine the class on whose behalf plaintiff sues, to decide if it is a true class and if the plaintiff is the proper representative.

To compensate for the increased sweep and gravity of a class judgment, however, Rule 23 now emphasizes the flexibility which a trial court exercises in the management of the action. This should serve to focus the attention of the courts on the need to conduct the litigation without undue complication or repetition. See Rule 23(d); Cohn, supra at 1218. It is this flexibility which indeed enables us to view liberally claims which assert a right to a class action in 10b–5 cases at the early stages of the litigation, as we have on this appeal from an order to strike part of the complaint.[10] See generally Note, Class Action Treatment of Securities Fraud Suits Under the Revised Rule 23, 36 Geo.Wash.L.Rev. 1150 (1968). The Court of Appeals for the Tenth Circuit has stated the guiding principle thus:

> "It cannot be denied that the resolution of the class action issue in suits of this type places an onerous burden on the trial court. But if there is to be an error made, let it be in favor and not against the maintenance of the

class action, for it is always subject to modification should later developments during the course of the trial so require." Esplin v. Hirshi, 402 F.2d 94 (10th Cir., Sept. 30, 1968).

### B. *Requirements of the Rule*

Rule 23 requires a litigant who would bring a class action to overcome two hurdles. First, he must satisfy all the conditions of 23(a) and then he must also convince the court that his action is appropriate under one of the three subdivisions of 23(b). Here, Green relies on 23(b) (3) which requires the court to find that common questions of fact or law predominate as to all members of the class and that a class action is superior to alternative ways of conducting the litigation.

Since the class Green seeks to represent numbers over 2,000, the requirement of 23(a) (1) that joinder of all members would be impracticable is easily met.[11] We are also of the view that the representative party will fairly and adequately protect the interest of the class, Rule 23(a) (4). We do not perceive, at this juncture of the case, any conflict of interest between Green and other members of the class. Moreover, it should be noted that Green was the only individual to bring suit before the Statute of Limitations barred other actions based on the alleged misrepresentations. We have also explained that quantitative factors, such as the fact that no other shareholders have sought to intervene in this action, are not relevant to consideration of the adequacy of plaintiff's representation under Rule 23(a) (4). Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968) (Eisen II).

---

**10.** Compare Brennan v. Midwestern United Life Ins. Co., 259 F.Supp. 673 (N.D.Ind. 1966) where the court allowed a 10-b-5 suit to proceed as a class action, with the possibility that its order might be amended later to strike the class action or to create subclasses, with Richland v. Cheatham, 272 F.Supp. 148 (SDNY1967) where a class action was denied, with the possibility of reinstating it after it had pro-

gressed further. We believe *Brennan* follows the better route, since once the class action aspect is struck, the litigation is likely to terminate.

**11.** Yet the group is not so large as to be impracticable. Compare Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968) (Eisen II) where the purported class numbers 3,750,000.

■ Rule 23(a) (3)—requiring that Green's claims be typical of the claims of the class—raises a more complex question. Since Green relies entirely on his purchase of shares after the third prospectus we are presented with the question as to whether he may represent those who purchased before the last prospectus was issued. See Dolgow v. Anderson, 43 F.R.D. 472, 492 (S.D.N.Y. 1968). Because it appears that the faulted misstatements alleged in the first two prospectuses are also present in the third prospectus, it would be logical and efficient to permit Green to represent all the purchasers, at least with respect to the common misrepresentations. Green should be permitted to present the elaborate proof of misstatement, intent, effect on price, and so on, that any purchaser of Wolf's stock between June 1961 and 1963 would need in order to succeed. If the trial court finds at some convenient time that a distinction must be drawn between those who purchased at different times, it is free to make use of the flexibility available to it and so important to the proper application of Rule 23. For example, it may divide the class into subclasses (i. e. those purchasing after issuance of the first prospectus; those purchasing after issuance of the first prospectus and circulation of the second prospectus; and those purchasing after issuance of the first prospectus and circulation of the second and third prospectuses) Rule 23 (c) (4), or make such other orders as are necessary, Rule 23(d). Compare Harris v. Jones, 41 F.R.D. 70 (D. Utah 1966) in which the court concluded it could cope with a class action, although the securities in question had been purchased at different times, under varying circumstances, and in response to separate representations, some oral and some written.

## C. *Common Questions*

Thus, the critical issue which emerges here, is whether questions common to the class exist, Rule 23(a) (2), and if so, whether these questions predominate over the individual issues as required by Rule 23(b) (3). As our examination of the genesis of Rule 23 indicates, we approach this question with due respect for the binding effect of a class judgment, but also cognizant of the freedom in the management of the class action given trial courts by that rule. Also, we are not unmindful of the importance of 10b–5 class actions as a weapon against securities fraud and the wisdom of avoiding over-rigidity in blocking such suits.

■ Green argues that certain misrepresentations and omissions which caused the cash available for distribution to be overstated are common to all three prospectuses. Although it is not feasible to discuss each detail of these alleged misrepresentations without unduly protracting this opinion, it is sufficient for us to state that we agree with the assertion that the misstatements and omissions claimed with regard to the Tidelands Motor Inn account are common to all three prospectuses.[12] Green asserts, *inter alia*, that the prospectuses failed to disclose various *sub rosa* payments made by Joseph Wolf and others to the management of the Tidelands Motor Inn to enable the latter to pay its rent to Wolf Corp. Green further claims that the rental payable on the Tidelands property, included by Wolf Corp. as an asset in computing the cash available for distribution, was worthless since Tidelands was not generating enough income to pay the rent. The Tidelands rental is a significant part of the total cash claimed by Wolf as available for distribution to shareholders; monetarily it is by far the most significant item in Green's list of

12. Wolf argues that the statements of cash available in the first and second prospectuses are mere projections while that in the third prospectus is an actual statement. Hence, it is claimed that there is no common question even if the same misstatements appear in all three. We reject this distinction because the reasonable assumptions on which the projections in the first two prospectuses were made (that the exchange offer would be consummated and that the operation of the properties would continue) are not relevant to the misrepresentations alleged.

misrepresentations. Of a total claimed overstatement of $215,366 in the first prospectus Green attributes $187,000 to the inclusion of the Tidelands rental in the statement of cash available. In the second prospectus, it totals $187,000 of a claimed overstatement of $343,416; and in the third prospectus $225,958 is alleged to be due to Tidelands misstatements, out of a total of $529,146. In sum, since there is a common question with regard to Tidelands, there is a common question with regard to the bulk of Green's allegations.[13]

Every misrepresentation or omission which Green alleges is to be found in the third prospectus. Thus, if Green can prove his case with respect to all the elements of this last prospectus, he will provide all the proof required on the issue of misrepresentation for any other plaintiff, even if the other members of the class purchased their stock before the third prospectus was issued. This too leads us to conclude that common questions of fact and law exist.

In addition, Green's action will set out the complex background common to all those who might have been injured, showing the structure and history of Wolf Corp., the alleged use of the prospectuses to manipulate the price, any proof of intent to manipulate, etc. Moreover, Green argues that Wolf, in making the interrelated misrepresentations in all three prospectuses, engaged in a common course of conduct designed to continually manipulate the market price of Wolf stock. Several courts have satisfied themselves that such a common and consistent course of conduct constitutes a common question under Rule 23. Dolgow v. Anderson, supra 43 F.R.D. at 489; Fischer v. Kletz, 41 F.R. D. 377, 381 (SDNY 1966 ("Like standing dominoes * * * one misrepresentation in a financial statement can cause subsequent statements to fall into inac-

curacy and distortion * * * ")). See Harris v. Palm Springs Alpine Estates, 329 F.2d 909 (9th Cir. 1964) (decided under the prior Rule 23).

Wolf contends that the prospectuses differ with respect to various minutia and that not all the allegations Green asserts apply to all prospectuses. This may prove to be true, and the differences alleged may even be relevant to the merits of Green's case. But the distinctions are too fine to justify denying a class action at this stage. The district court may use the procedures suggested by Rule 23 to cope with these distinctions, if, indeed, they exist. We shall not attempt either to pre-try or pre-judge all the facets of this case on an appeal from a motion to strike allegations of the complaint. Cf. Siegal v. Chicken Delight, 271 F.Supp. 722, 726 (N.D.Cal. 1967). The very purpose to be served by a class action is the opportunity it affords to prevent a multiplicity of suits based on a wrong common to all. *Kaplan*, supra, at 390. If we were to deny a class action simply because all of the allegations of the class do not fit together like pieces in a jigsaw puzzle, we would destroy much of the utility of Rule 23.

**D.** *Predominance of Common Questions*

We find that the common questions predominate over the individual issues involved in this action. The Advisory Committee on Rule 23 noted that

"* * * a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action and it may remain so despite the need, if liability is found for a separate determination of the damages suffered by individuals within the class. On the other hand, although showing some common core, a fraud case may be unsuited for treatment as a class action if

---

13. We also find certain sums owing with respect to property at 10 East 40th Street, New York, N. Y. (the Arnold Constable receivable) which Green questions, are common to all three prospectuses.

Green claims that misrepresentations were made with respect to this property in each prospectus in the amounts of $28,-366, $30,059 and $24,890 respectively.

there was a material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed." Proposed Amendments to the Rules of Civil Procedure, 39 F.R.D. 69, 103 (1966).

Wolf earnestly argues that each person injured must show that he personally relied on the misrepresentations in order to recover and thus any common issues of misrepresentations do not predominate over the individual questions of reliance. Even if Wolf is correct in its assertion of the need for proof of reliance, and we express no views on that issue, we must still reject the argument. Carried to its logical end, it would negate any attempted class action under Rule 10b–5, since as the District Courts have recognized, reliance is an issue lurking in every 10b–5 action. Kronenberg v. Hotel Governor Clinton Inc., 41 F.R.D. 42, 45 (SDNY 1966). We see no sound reason why the trial court, if it determines individual reliance is an essential element of the proof, cannot order separate trials on that particular issue, as on the question of damages, if necessary. The effective administration of 23(b)(3) will often require the use of the "sensible device" of split trials. Frankel, supra, 43 F.R.D. at 47.

E. *Superiority of the Class Action*

The last, and in many ways, the most important requirement to be met before this litigation can be allowed to proceed under Rule 23(b)(3) is that the class action device must be superior to other methods available for a fair and efficient adjudication of the controversy. If a class action is markedly superior to all the alternatives, then, at least at the early stages of the litigation, we should construe broadly the other elements of Rule 23, to permit the efficient enforcement of 10b–5 through class actions with appropriate safeguards. Note, supra, 36 Geo.Wash. at 1168. The Court of Appeals for the 7th Circuit has instructed that the relevant question to consider in deciding if a class action is superior to other procedures is the number injured by the alleged violation of 10b–5. Hohmann v. Packard Inst. Co., 399 F.2d 711 (7th Cir., July 17, 1968). Here as many as 2,200 purchasers of Wolf stock might have been harmed, and not one of them seems to have been injured seriously enough to motivate the initiation of a solely individual action.[14]

In sum, we hold that this is a proper case for a class action. We recommend to the district court that it make use of the freedom afforded it by Rule 23 to manage the litigation efficiently and fairly, including the creation of any necessary subclasses. We recognize that this might, in cases such as this, place additional burdens on judges but the alternatives are either no recourse for thousands of stockholders to whom the courthouse would thus be out of bounds or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake.[15]

14. Green also calls to our attention that anyone who now wishes to sue on the basis of the representations in these prospectuses (but Green) would be barred by the Statute of Limitations. This would not, of course, bar those who wish to intervene in this action, see Escott v. Barchris Const. Corp., 340 F.2d 731 (2d Cir. 1965), cert. denied 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63. But to deny a class action under such circumstances would have serious consequences, since all those injured except Green would now have no other remedy, although they may have been relying on Green's class action for their balm. Note that permitting intervention does not necessarily enlarge the period of limitations since the class action relates back to the date of the complaint. Phila. Elec. Co. v. Anaconda Am. Brass Co., 43 F.R.D. 452, 461 (ED Pa.1968).

15. One further point must be made before we conclude our discussion of class actions. We are aware that one of the most difficult problems raised by the new Rule 23 is the requirement that notice must be sent to every member of the class in a 23(b)(3) action. Rule 23(c)(2). Such notice is expensive and may even cause fluctuations in the price of the stock. Hence, a court in this circuit decided to hold a hearing in order to deter-

### III—PUNITIVE DAMAGES

#### A. *Appealability*

██ Green asks us to reverse the District Court's order striking his prayer for punitive damages from the complaint.[16] We question whether such an order would be appealable. Harvey Aluminum v. International Longshoremen's and Warehousemen's Union, Local 8, 278 F.2d 63 (9th Cir. 1960). The court's order does not terminate the litigation, as is the case with a denial of the right to proceed with a class action, *Eisen I*, supra, since the lure of actual damages is adequate to insure vigorous prosecution of the litigation. Moreover, the propriety of the order could be reviewed eventually upon an appeal from a final judgment in the action. Nonetheless, this litigation is properly before us on the class action appeal. And, since our holding on that issue necessarily and inevitably will result in this case going forward in the district court, we believe that we should give the District Court guidance with respect to the punitive damages issue. Such a course will not only minimize the possibility of an expensive and time-consuming retrial of this complicated case, but will result in a more expeditious trial itself. See Gillespie v. U. S. Steel Corp., 379 U.S. 148, 153, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964). Also, it will provide some guide on an appellate level regarding new and important problems of first impression. See Schlagenhauf v. Holder, 379 U.S. 104, 111, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964). The issue of punitive damages was carefully considered by the court below and has been fully briefed by both sides on appeal. Accordingly, we have chosen to discuss the question now.

#### B. *§ 28(a) of the Securities Exchange Act*

██ Although we find no extensive federal appellate discussion of the problem, several District Courts have examined the issue and have determined that punitive damages may not be recovered in actions under Rule 10b–5 and § 10(b) of the 1934 Act because § 28(a) of that act, 15 U.S.C. § 78bb(a), limits recovery in private suits for damages to "actual damages." Meisel v. North Jersey Trust Co. of Ridgewood, New Jersey, 216 F. Supp. 469 (SDNY 1963); Pappas v. Moss, 257 F.Supp. 345 (D.N.J.1966), reversed on other grounds 393 F.2d 865 (1968); Note, Measurement of Damages in Private Actions Under Rule 10b–5, 1968 Wash.U.L.Q. 164. We agree with those conclusions.

Green contends that § 28(a) was intended solely to prevent "double recovery," that is recovering twice for the same injury by bringing both federal and state law suits. Unfortunately, we find little aid in the legislative history.[17]

---

mine if plaintiff's case is substantial enough to impose the liability of sending this notice on defendants and further if plaintiff should be permitted to proceed with expensive and time-consuming discovery procedures Dolgow v. Anderson, supra. Another District Court has rejected such a hearing. Mersay v. First Republic Corp. of America, 43 F.R.D. 465, 469 (SDNY 1968). This question is not before us now since Green has offered to pay the costs of sending the notice. Nor is there a danger of price fluctuations because the stockholders have already been told the essence of Green's claim in the notice the SEC required Wolf to send each shareholder as part of the consent judgment. Moreover, whatever the merits of such a hearing when ordered by the district court, we believe that, since we hold today that Green may proceed with his action on a class suit basis, any hearing on the sufficiency of his claim would be redundant. We express no opinion, of course, as to whether he states a legally sufficient claim but that issue, and the related discovery questions, would have to be faced by the district court even if Green sued solely in his own behalf.

16. We, of course, express no opinion as to whether Green has a proper claim for actual damages.

17. The principal reference reads, "This subsection reserves rights and remedies existing outside of those provided in the act, but limits the total amount recoverable to the amount of actual damages." H.Rep.No. 1383, 73rd Cong., 2d Sess. (1934) 28.

Thus we must construe the Act to carry out its purpose. See Gordon v. Motel City "B" Associates, 403 F.2d 90 (2d Cir. decided October 14, 1968). We do not believe that Congress intended the Securities and Exchange Act to be used as a vehicle for the recovery of judgments that could often be grossly disproportionate to the harm done.[18]

It is true that punitive damages are permitted under the Securities Act of 1933, but that Act does not contain language similar to § 28(a) of the 1934 Act. Congress might well have intended to impose different liabilities under each of the two Acts since at the time of its enactment the requirements of the 1934 Act could have been avoided if corporations simply refused to register on the exchanges. The provisions of the 1933 Act were less easily evaded. Hence, lighter penalties under the 1934 Act would have been an inducement for corporations to comply with its terms and not "go on strike," Globus v. Law Research Service, 287 F.Supp. 188 (SDNY 1968).

Moreover, when the 1934 Act was passed, it was not envisioned that it would provide the basis for so many private actions. Indeed, until J. I. Case v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), no one was sure that private actions could flow from violations of the securities acts. Green's argument that since a cause of action here is only implied, the cause of action should have all the attributes of common law fraud is unfounded. We have gone far beyond the limits of the common law in imposing liability under 10b–5 and thus may not import all the other aspects of common law fraud without scrutiny. See SEC v. Texas Gulf Sulphur Corp., 401 F.2d 833 (2d Cir. decided August 13, 1968).

### C. *Policies of Punitive Damages Not Furthered by Allowing Them Here*

Punitive damages can be justified only as retribution or as a deterrent measure. Restatement, Torts § 908, Comment a; see generally, Note, The Imposition of Punishment by Civil Courts: A Reappraisal of Punitive Damages, 41 N.Y.U.L.Rev. 1159 (1966). The purpose of retribution would not be served by imposing punitive damages for violations of 10b–5 at least as against a publicly held corporation, such as Wolf, because the heavy burden would ultimately fall on all the stockholders, including mere innocent pawns. Thus, some courts have gone so far as to refuse to permit any punitive damages against corporations. Prosser, Torts § 2 at 12 (3d ed. 1964).

Nor are punitive damages needed as a deterrent in this area. In cases such as this it is possible that corporations and even other individuals such as officers, would be subject to crushing liabilities simply on the basis of actual damages because of the cumulative injury that a misstatement concerning widely held stock can cause. As we have discussed in Section II of this opinion, class actions, derivative suits and other such procedural devices provide sufficient incentive to insure that those injured by a violation of 10b–5 will have adequate opportunity to confront alleged malefactors and to have appropriate sanctions imposed upon them. Moreover as an added deterrent the Securities Exchange Act of 1934 contains provisions imposing criminal penalties on violators. 15 U.S.C. § 78ff.

Accordingly, we conclude that punitive damages are not authorized in private actions under § 10(b) and Rule 10b–5.

---

18. We cannot ignore entirely huge and perhaps capricious punitive damages which some juries have awarded. E.g., Curtis Pub. Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1957) ($3 million, reduced by the court to $400,000); Faulk v. Aware Inc., 19 App.Div.2d 464, 244 N.Y.S.2d 259 (1st Dept.1963), aff'd mem. 14 N.Y.2d 899, 252 N.Y.S.2d 95, 200 N.E. 2d 78 (1964), cert. denied 380 U.S. 916, 85 S.Ct. 900, 13 L.Ed.2d 801 (1965) ($2.- 5 million, reduced by the court to $150,- 000).

HAYS, Circuit Judge (concurring in part and dissenting in part):

I concur in the court's determination as to the propriety of a class action. I dissent from Part III of Judge KAUFMAN'S opinion on the ground that the issue of punitive damages is not appealable.