## In re LIVENT, INC. NOTEHOLDERS SECURITIES LITIGATION.

### No. 98 Civ. 7161(VM).

United States District Court, S.D. New York.

Nov. 6, 2002.

Stanley M. Grossman, Patrick V. Dahlstrom, Pomerantz, Haudek, Block, Grossman & Gross, LLP, New York City, Lionel Z. Glancy, Peter A. Binkow, Glancy & Binkow,

LLP, Donald R. Wager, Los Angeles, CA, for Dorian King.

Ronald A. Nimkoff, Harvey B. Silikovitz, Schechter & Nimkoff, LLP, New York City, Harvey L. Pitt, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Garth H. Drabinsky, Myron I. Gottlieb.

John T. Behrendt, Peter Justus Beshar, Aric Hugo Wu, Lee Gorson Dust, Gibson, Dunn & Crutcher, LLP, New York City, for Deloitte & Touche Chartered Accountants.

Leon P. Gold, Leslie J. Harris, Proskauer, Rose, LLP, New York City, for Daniel D. Brambilla.

William H. Gussman, Jr., Howard O. Godnick, Stacy P. Aronowitz, Schulte, Roth & Zabel, LLP, New York City, for Cibc Wood Gundy Securities, Inc. and Cibc Oppenheimer.

D. Brian Hufford, Pomerant, Haudek, Block, Grossman & Gross, LLP, New York City, for Gordon Eckstein, Robert Topal, Cibc Oppenheimer.

Cynthia A. Feigin, Hogan & Hartson, LLP, W. Sidney Davis, Stanley N. Futterman, New York City, for Robert Topal.

Greg A. Danilow, Stephen A. Radin, Sofia Giatrakos, Weil, Gotshal & Manges, LLP, New York City, for H. Garfield Emerson.

Cynthia A. Feigin, Hogan & Hartson, LLP, W. Sidney Davis, Stanley N. Futterman, New York City, for Robert Topal.

Eric M. Roth, Wachtell, Lipton, Rosen & Katz, New York City, for A. Alfred Taubman.

Jonathan Rosenberg, O'Melveny & Myers, LLP, Bradley Jay Butwin, James L. Burns, O'Sullivan, LLP, New York City, for Martin Goldfarb.

James S. Dittmar, Sanford F. Remz, William J. Connolly, III, Hutchins, Wheeler & Dittmar, Boston, MA, for Thomas H. Lee, James A. Pattison, Scott Sperling, Joseph L. Rotman.

## DECISION AND ORDER

MARRERO, District Judge.

Lead Plaintiffs Dorian King and Diane King (the "Kings") filed suit on October 9, 1998 against Garth Drabinsky, Myron Gottlieb, CIBC Wood Gundy Securities, Inc. ("CIBC Wood Gundy"), CIBC Oppenheimer Securities Corp. ("CIBC Oppenheimer"), Deloitte & Touche Chartered Accountants ("Deloitte"), and various other named individuals, (collectively, "Defendants") and now seek an order certifying (a) a class (the "Noteholder Class") defined as all persons and entities, other than the Defendants, who purchased Livent, Inc. 9⅜% Senior Unsecured Notes Due 2004 (the "Notes") during the period from October 10, 1997 through and including August 10, 1998 (the "Class Period"), and (b) a noteholder subclass (the "Subclass") defined as all persons and entities, other than the Defendants, who purchased Notes during the Class Period from CIBC Wood Gundy, CIBC Oppenheimer, (collectively, the "CIBC Defendants") or anyone else acting on their behalf. The Kings further seek certification of themselves as Class Representatives for the Class and Subclass as well as certification of the law firms of Pomerantz Haudek Block Grossman & Gross LLP and the Law Offices of Lionel Z. Glancy as Lead Counsel for the Class and Subclass.

Plaintiffs seeking class certification must prove that the proposed class action satisfies four prerequisites set forth in Federal Rule of Civil Procedure 23(a), namely, that:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The burden is on plaintiffs to show that each of these requirements has been satisfied. Additionally, plaintiffs seeking class certification must satisfy one of the categories set forth in Rule 23(b). The Kings seek certification pursuant to Rule 23(b)(3), requiring that

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D) the difficulties likely to be encountered in the management of a class action.

*See, e.g., In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 132–33 (2nd Cir. 2001). "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Id.* at 133 (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). The Court begins its analysis with the claim advanced by Deloitte that individual questions of fact concerning the issue of reliance on alleged misrepresentations and omissions will predominate if class certification is granted.

The Kings argue that "alleged individual issues of reliance do not predominate, where the complaint alleges a scheme embodying common misrepresentation to the entire class." (Plaintiffs' Reply Memorandum In Support of Their Motion for Class Certification dated June 3, 2002 ("Pl.'s Reply Memo"), at 9.) The Kings rely on a series of Second Circuit and Southern District cases in which reliance was rejected as a basis to deny class certification. None of these cases, however, involved securities traded in a market determined to be inefficient. Market efficiency is relevant because, in asserting their claims pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),

(Third Amended Complaint, ¶ 306), the Kings rely on a "fraud on the market" theory under which reliance on public misrepresentations and omissions is presumed, thus obviating the need for each individual purchaser to establish reliance, an element of a § 10(b) claim. *See Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2nd Cir.1996) ("reasonable reliance must be proved as an element of a securities fraud claim."). (Deposition of Dorian King ("Dorian King Dep."), at 71–72 (King "never reviewed any public offerings or information regarding [Livent] from any source prior to making the investment."); Deposition of Diane King ("Diane King Dep."), at 67.)

In elaborating the principles underlying the distinction, this Court has stated: "Fraud on the market theory is the hypothesis that an efficient securities market rapidly incorporates all publicly available information about a company's business and financial situation into the company's stock price. Accordingly, a party who purchases the stock need not show that it directly relied upon or even knew about the alleged fraudulent misrepresentations." *Saddle Rock Partners, Ltd. v. Hiatt*, No. 96–CV–9474, 2000 WL 1182793, at *3 (S.D.N.Y. August 21, 2000) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 247, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). In contrast to efficient markets,

inefficient markets by definition to not translate all available information into the price.... In such markets, the price of a security does not necessarily reflect all omissions and representations regarding that security. In this context, an inference of causation and reliance is inapposite. Thus, application of the "fraud-on-the-market" theory to inefficient markets would essentially eliminate causation as an element .... We are unwilling to read the causation requirement out of [§ 10(b)] private actions.... We therefore hold that the "fraud-on-the-market" theory will only apply where the market concerned is an efficient one.

*Reingold v. Deloitte Haskins & Sells, Yarwood Vane*, 599 F.Supp. 1241, 1264 (S.D.N.Y. 1984).

Pertinent to the application of these rules, this Court also has asserted that "a trial

court must conduct a rigorous analysis to ensure that the prerequisites of Rule 23 have been satisfied before certifying a class . . . ." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 134–35 (2nd Cir.2001) (citation omitted; internal quotations omitted); *see Selby v. Principal Mutual Life Ins. Co.*, 197 F.R.D. 48, 54 (S.D.N.Y.2000). "While Rule 23 does not authorize a court to inquire into the merits of a suit, the court may go beyond the pleadings and consider *the range of proof necessary* to support class certification." *Daniels v. The City of New York*, 198 F.R.D. 409, 413 (S.D.N.Y.2001) (citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)) (emphasis added); *Ansoumana*, 201 F.R.D. at 85.

Because "fraud on the market" theory presupposes an efficient market, and because the absence of the presumption of reliance arising out of this theory may lead to atypical and individual issues of fact regarding reliance, the Court must examine the record to determine whether the Kings have made an adequate showing of market efficiency. Having examined the submissions of the parties, the Court concludes that the Kings have failed to do so. In particular, the Court relies on the following points in reaching this conclusion:

The Notes were not traded on any public exchange. Rather, they were bought and sold through an informal net of contacts among institutional investors and brokers who would exchange bids and negotiate prices privately. Therefore, there was no centralized source of price and trading information, (Affidavit of Charles Cox, dated April 18, 2002 ("Cox Aff."), ¶¶ 13, 14, 18), meaning there was no fixed or consistent price for the Notes at any given time. This circumstance, in turn, resulted in great variation in the Notes' sale prices from day to day. (*Id.*, Ex. C). The Court finds the absence of a source for readily available public information about trading in the Notes, and the variation in the price of the Notes that resulted, as inconsistent with the central tenet of "fraud on the market" theory, which presupposes that "an efficient securities market rapidly incorporates all publicly available information about

a company's business and financial situation . . . ." *Saddle Rock Partners, Ltd.*, 2000 WL 1182793, at *3; *see also RMED Int'l Inc. v. Sloan's Supermarkets, Inc.*, 185 F.Supp.2d 389, 404–405 (S.D.N.Y.2002) ("numerous courts have held that stocks trading on the AMEX are almost always entitled to the ['fraud on the market'] presumption.").

The price of the Notes does not appear to have been appreciably and promptly affected by news about Livent, Inc. ("Livent"), either positively or negatively during the Class Period. That is, the evidence indicates that when allegedly misleading information was disseminated, the Notes prices did not promptly and appreciably rise, and when these irregularities and misrepresentations were made public, the prices did not promptly and appreciably drop. (Cox Aff., ¶¶ 23–24, Ex. E–F; Affidavit of Daniel Weaver, dated May 31, 2002 ("Weaver Aff."), Ex. B–G.) By contrast, the price of Livent stock fluctuated significantly in response to such information. (Cox Aff., ¶ 24, Ex. G.)

The Kings' expert, Daniel Weaver, maintains that "company specific information normally does not have a significant impact on prices [of debt securities]" (Weaver Aff., ¶ 8), adding that "[i]f there is very little chance of not getting paid, then there is no need for concern about the issuer's financial results." (*Id.*, ¶ 10). Accordingly, Weaver explains away the independence in pricing during the first half or so of the Class Period (through February 17, 1998) as normal for a debt security. Regarding the second half, he distinguishes between anticipated information, which he argues the pricing trends incorporated gradually, and unanticipated information, which was incorporated promptly. (Weaver Aff., ¶¶ 27, 28, *et seq.*)

Whether or not the Notes' pricing trends resulted from some characteristic of debt securities is immaterial, however, because what matters for present purposes is whether that market did or did not "rapidly incorporate[ ] all publicly available information about a company's business and financial situation . . . ." *Saddle Rock Partners, Ltd.* 2000 WL 1182793, at *3. The expert evidence adduced by both sides in this case, referenced above, indicates that the Notes' mar-

ket did not so respond during the Class Period overall, the parties' differing explanations notwithstanding. This apparent independence in pricing indicates to the Court that the market for the Notes during the Class Period was not efficient. *See id.; Seagoing Uniform Corp. v. Texaco, Inc.*, No. 84–CV–1730, 1989 WL 129691, at *7 (S.D.N.Y. October 24, 1989) ("the rise in Texaco's stock price during the relevant period was consistent with the Semi–Strong Efficient Market Theory that the market was reacting positively to publicly disclosed information, namely, the possibility of a takeover.").

Finally, the evidence before the Court indicates that the Notes were not widely held. According to this record, 91 percent of the Notes sold during the Class Period were owned by 14 institutional investors. (Declaration of Douglas Kraus, dated November 3, 1998 ("Kraus Decl."), ¶ 12, Ex. A.) and some 106 institutional investors were responsible for 98 percent of the entire trading volume during the Noteholder Class Period, (Cox Aff., ¶ 37; Weaver Aff., ¶ 57). Indeed, only two percent of the trading volume of the Notes during the Class Period was attributable to so-called "retail" investors. (Cox Aff., ¶ 37; Weaver Aff., ¶ 57.) The Kings, therefore, constitute part of this remaining two percent of retail purchasers.

The fact that the Notes "were not traded actively in a large public market" counsels against the application of fraud on the market theory. *Sable v. Southmark/Envicon Capital Corp.*, 819 F.Supp. 324, 339 (S.D.N.Y. 1993). Without an adequate showing of an efficient market for the Notes, the fraud on the market theory is unavailable to the members of the proposed Class and Subclass. Consequently, reliance on the alleged omissions and misrepresentations by the Defendants is not presumed.

Furthermore, the Kings admit that they did not examine any financial documents pertaining to Livent or the Notes before purchasing them. (Dorian King Dep., at 71–72.; Diane King Dep., at 67.) By contrast, institutional investors, in Weaver's words, "aggressively seek out information and have a great deal of expertise in analyzing it." (Weaver Aff., ¶ 19, 56–58.) In the absence of a common presumption of reliance, the Court finds this juxtaposition between the Kings—retail investors who conducted no primary research into their investment—and the bulk of the proposed Class and Subclass—institutional investors which likely did—to present significant differences of fact that speak to an essential element of the § 10(b) claims, namely, reliance on the alleged omissions and misrepresentations in financial reports.

Rule 23(b)(3) requires the Court to "decide whether 'questions of law or fact common to the members of the class predominate over any questions affecting only individual members,' and whether a class action 'is superior to other available methods for the fair and efficient adjudication of the controversy.'" *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2nd Cir.2002) (quoting Fed.R.Civ.P. 23(b)(3)). "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Id.; see In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 136.

In its notes on Rule 23, the Advisory Committee on the Federal Rules states that "[a]lthough having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed." That is the case here. Because the Kings constitute part of the Notes' mere two percent of retail purchasers, the rest being sophisticated institutions, and because the Kings conducted no primary research before investing in the Notes, whereas the institutions likely did, the Court finds that the Kings have failed to show that individual questions of fact, namely, reliance on the alleged omissions and misrepresentations, will not predominate. Accordingly, the Court concludes that the requirements of Rule 23(b)(3) have not been satisfied.

It is true that courts in this Circuit have recognized that securities cases can be certified as class actions despite individual differences in reliance because such differences

can be accounted for through separate trials. *See Green v. Wolf Corp.*, 406 F.2d 291, 301 (2nd Cir.1968). This mechanism, however, is applied most logically to situations where the securities at issue were traded in an efficient market, thus creating a common presumption of reliance among the class members, because this common presumption renders those individual members to whom the presumption does not apply exceptions to the general rule. *See Fisher v. The Plessey Co., Ltd.*, 103 F.R.D. 150, 156 (S.D.N.Y.1984) ("[D]efendants may seek to *rebut a presumption of reliance* by demonstrating that individual debenture holders [of securities publicly traded on AMEX] had access to and knowledge of the omitted information, and therefore placed no reliance on the tender documents.... If necessary, the Court can hold separate hearings on the issue of reliance." (emphasis added)); *see also Green,* 406 F.2d at 301 (in factual context of fraud dispute over *publicly traded securities,* the Second Circuit stated that trial court could certify a class action despite differences in reliance by "order[ing] separate trials on that particular issue ...."). Accordingly, the availability of this separate trials mechanism does not change the Court's conclusion given the facts of this case.

In addition, these same differences undercut the Kings' showing of typicality pursuant to Rule 23(a)(3)[1] and adequate representation pursuant to Rule 23(a)(4)[2] insofar as they expose the Kings to potential "unique defenses" that would be inapplicable to the institutional investors constituting the bulk of the proposed Class and Subclass. Without commenting on the likelihood of success, the Court notes in this vein that various defenses asserted by Deloitte, including lack of due care by the plaintiffs and lack of proximate cause, (Answer and Cross–Claims [by Deloitte], ¶¶ 330, 331), have been asserted in this matter. The merits of these contentions would seem to be materially affected by the difference in research and analysis between classes of investors as a function of reliance. As the Second Circuit has explained, "[w]hile it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification ... class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation .... Regardless of whether the issue is framed in terms of the typicality of the representative's claims, Rule 23(a)(3), Fed.R.Civ. P., or the adequacy of its representation, Rule 23(a)(4), Fed.R.Civ.P., there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Gary Plastic Packaging Corp.*

1. Rule 23(a)'s typicality requirement is established where

   the claims of the representative Plaintiffs arise from the same course of conduct that gives rise to the claims of the other Class members, where the claims are based on the same legal theory, and where the class members have allegedly been injured by the same course of conduct as that which allegedly injured the proposed representatives.

   *In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 510 (S.D.N.Y.1996); *see In Re Drexel Burnham Lambert Group,* 960 F.2d 285, 291 (2nd Cir.1992). "Typicality, however, does not require that the situations of the named representatives and the class members be identical." *In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. at 510. The class representatives must "have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *In re Oxford Health Plans, Inc., Sec. Litig.,* 191 F.R.D. 369 375 (S.D.N.Y.2000) (quoting *In re NASDAQ Market–Makers Antitrust Litig.,* 169

F.R.D. at 510). Furthermore, "[t]ypicality refers to the nature of the claim of the class representatives and not to the specific facts from which the claim arose or relief is sought...." *In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. at 510.

2. Adequacy of representation is governed by Rule 23(a)(4), which requires a twofold showing: "(1) the representatives' interests must not conflict with the class members' interests, and (2) the representatives and their attorney must be able to prosecute the action vigorously." *In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. at 512; *see In re Oxford Health Plans, Inc., Sec. Litig.,* 191 F.R.D. at 376. The "commonality and typicality requirements blend together in determining whether the representative plaintiffs' claims are typical enough of the classwide claims that the representatives will adequately represent the class." *In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. at 512 (citing *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 157, n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

*v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2nd Cir.1990) (citations omitted).

## ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the Kings' motion for class certification is DENIED.[3]

**SO ORDERED.**

---

**3.** In an Order dated October 18, 2002, this Court granted final approval of a settlement agreement involving the Outside Directors of Livent named as defendants in this matter, and in so doing the Court certified a class of noteholders for purposes of settlement. There exists no conflict between that order and the present one, however, because the Court in the present Order denies class certification based on individual and atypical predominating questions regarding reliance, an element of the Kings' § 10(b) claim. The Outside Directors involved in the aforementioned approval of final settlement faced no claim pursuant to § 10(b) because this Court dismissed the Kings' § 10(b) claim against these particular defendants in a Decision and Order dated June 29, 2001. *See In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 434 (S.D.N.Y.2001). Because the remaining claims against the settling Outside Directors were grounded on § 11, and thus did not require proof of reliance, the Court's reasoning in its present Order is inapplicable to its considerations underlying its October 18, 2002 approval Order.