Herbert **FELDMAN** et al., Plaintiffs,

v.

Robert K. **LIFTON** et al., Defendants.

No. 72 Civ. 741.

United States District Court,
S. D. New York.

Nov. 7, 1974.

Ira Jay Sands, New York City, for plaintiffs Richard Gagliano and Jennie Gagliano.

Demov, Morris, Levin & Schein by Irving Bizar, New York City, for plaintiff Herbert Feldman.

Nickerson, Kramer, Lowenstein Nessen & Kamin by Geoffrey M. Kalmus, New York City for defendants Robert K. Lifton, Frank E. Conant, Howard L. Weingrow, Sanford M. Friedman, Lewis R. Cohen and Harry Ball.

Adler, Schwartz & Blass, New York City, for defendant Louis S. Adler.

Cole & Deitz, New York City, for defendant Hertz, Herson & Co.

Shea, Gould, Climenko & Kramer, by Leon P. Gold, New York City, for defendant Touche Ross & Co.

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants Omega-Alpha, Inc., as successor in interest to Transcontinental Investing Corp. and James J. Ling.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiffs Herbert Feldman and Richard and Jennie Gagliano move to amend their complaint in this consolidated action under the securities laws. Plaintiffs also renew an earlier motion for an order pursuant to Rule 23, F.R.Civ.P., declaring this to be a proper class action.[1] Both motions are denied.

On February 22, 1972, Feldman and the Gaglianos filed separate actions against defendant Transcontinental Investing Corporation (TIC) and several of its subsidiaries; Omega-Alpha, Inc. (O-A); Touche Ross & Co. and Hertz, Herson & Co., auditors and accountants for TIC; and several past and present officers and directors of TIC and O-A. In March 1972, plaintiff Feldman's motion for a class action determination was denied without prejudice to its renewal. Shortly thereafter, the two actions were

consolidated by stipulation, and on May 26, 1972, plaintiffs filed their amended consolidated complaint.

More than a year later, in August 1973, plaintiffs renewed their motion for a determination that the putative class defined in the amended consolidated complaint of May 1972 was a proper class. Plaintiffs did not indicate at that time that they intended to amend their complaint. Consideration of the class action motion was adjourned to await the Supreme Court's decision in Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S. Ct. 2140, 40 L.Ed.2d 732 (1974), and it was not until June 26, 1974, that plaintiffs moved to amend the complaint, changing the membership of the proposed class as described below.

The presently effective complaint of May 1972 alleges a series of misrepresentations in the financial statements and other documents which TIC circulated among investors and filed with the SEC over the ten-year period, 1962–72. This series of misstatements is alleged to constitute a "course of conduct" in violation of Section 17 of the Securities Act of 1933; Sections 10, 14, 18 and 20 of the Securities Exchange Act of 1934; Sections 7, 36 and 37 of the Investment Company Act of 1940; and common law principles.

### A. *Motion to Amend the Complaint*

#### (1) *The Proposed Amendment.*

Paragraph 4 of the June 1972 complaint states that the class consists of two groups which together number approximately 12,000–15,000 investors: (a) those who purchased securities of TIC from January 1, 1962, to February 15, 1972, in reliance upon allegedly false financial statements; and (b) those who purchased securities during some period, otherwise unspecified, in which TIC should have been registered as an in-

---

1. Defendants Transcontinental Investing Corp. and Omega-Alpha, Inc. and the individual defendants do not contest either motion. Only the accounting defendants, Touche Ross & Co. and Hertz, Herson & Co., filed papers in opposition.

vestment company under the Investment Company Act. Paragraph 5 states that plaintiff Feldman purchased TIC stock on October 10, 1967, and that the Gaglianos' decedent purchased "in or about 1968." Thus both plaintiffs are members of the class.

Plaintiffs' proposed amendment would redefine the class to include only those who purchased TIC stock from January 1, 1968, to March 8, 1972. The amendment would, however, add to the class all investors who purchased Omega-Alpha securities from October 22, 1971, to August 31, 1972.[2]

#### (2) *Requirements for Leave to Amend under Rule 15(a).*

Despite the liberal amendment policy of Rule 15(a), F.R.Civ.P., the Supreme Court has stated that leave to amend may be denied, *inter alia*, on a showing of any of the following: (i) undue prejudice to the opposing party; (ii) undue delay; (iii) futility of the amendment. Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

#### (a) *Prejudice:*

Defendant Touche Ross & Co.'s claim of prejudice as a result of plaintiffs' two-year delay is not sufficiently particularized to be credited. Green v. Wolf Corp., 50 F.R.D. 220, 223 (S.D.N.Y. 1970).

We think it proper, however to consider the possibility of prejudice to Omega-Alpha shareholders who are not presently class members, but would be added to the class by the proposed amendment.[3] It is charged that the reason that Omega-Alpha shareholders are to be added to the class is to bind them to any court-approved settlement with Omega-

Alpha and its principal officer, James J. Ling. This would preclude or limit them from asserting claims against their company and Ling in the future. As consideration for the proposed amendment and contemplated settlement, the class will apparently receive ten per cent of any recovery by Omega-Alpha against Touche Ross & Co. and Hertz, Herson & Co. in a separate suit now pending in this court.

We think it likely that such a settlement would be prejudicial to Omega-Alpha shareholders, and that the possibility of prejudice has been increased by plaintiffs' delay. The Omega-Alpha shareholders would have no representation in the settlement negotiations. At this late date, it is unlikely that Omega-Alpha shareholders will intervene. In the absence of such representation, proper consideration could not be given to the interests of the Omega-Alpha shareholders in respect of the terms of any settlement proposed.

#### (b) *Undue Delay*

Leave to amend should also be denied where all of the facts on which the proposed amendment is based were known to the moving parties at an earlier date, yet the motion to amend was delayed for a substantial period of time without adequate excuse. Christophides v. Porco, 289 F.Supp. 403, 408 (S.D.N.Y.1968); 6 Wright and Miller, *supra*, § 1488.

Here plaintiffs state that purchasers of Omega-Alpha shares from October 22, 1971, to August 31, 1972, were added to the class because the latter date was the day that Omega-Alpha made full and final disclosure of TIC's alleged fraudulent statements. Plaintiffs thereby ad-

---

2. Those who purchased TIC stock during the unspecified period that TIC should have been registered under the Investment Company Act would continue to be represented.
 No other change appears in the proposed amended complaint, except the correction of a typographical error.

3. Defendant Touche Ross & Co. has cited no authorities which require or permit us to consider possible prejudice to persons other than present parties to the action. But see, 6 C. Wright and A. Miller, Federal Practice and Procedure, § 1487.

mit that they waited almost two years after they learned the information necessary to the definition of the class before amending their complaint to include purchasers of O–A.

Plaintiffs also state that they eliminated from the class purchasers of TIC stock from 1962 to 1967 because the alleged misstatements "basically took place or had its [sic] greatest impact, in the period January 1, 1968 to March 8, 1972 * * *."

That explanation is difficult to reconcile with the fact that plaintiffs do not propose to amend any of the allegations of fraud, all of which refer to a course of conduct over the ten-year period, 1962–72.

#### (c) *Futility of the Amendment*

Where plaintiff's proposed amendment advances a claim or defense that is legally insufficient on its face or otherwise clearly without merit, this court has denied leave to amend. Christophides v. Porco, 289 F.Supp. 403, 408 (S.D.N.Y.1968); Johnson v. Partrederiet Brovigtank, 202 F.Supp. 859, 867 (S.D.N.Y.1962); 6 Wright and Miller, *supra,* § 1487.

 We think that it would be equally futile for a plaintiff in a class action to amend the complaint such that the proposed amendment would, on its face, violate class action requirements, and that in such a case, leave to amend should be denied. In this case, since neither named plaintiff is a purchaser of Omega-Alpha shares, neither can represent the Omega-Alpha investors whom plaintiffs propose to add to the class. Bailey v. Patterson, 369 U.S. 31, 32, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); Price v. Skolnick, 54 F.R.D. 261, 263 (S.D.N.Y.1971) (plaintiffs not permitted to represent purchasers of stock in particular subsidiaries where plaintiffs purchased only shares of parent and other subsidiaries); Bluestein v. Friedman, CCH Fed.Sec.L.Rep. ¶92,558 (S.D.N.Y.1970) at 98,944.

Similarly, by limiting the class of TIC investors to those who purchased after January 1, 1968, plaintiffs have disqualified Feldman from representing the class since he purchased on October 10, 1967. It is also questionable whether the Gaglianos may represent the class since it is alleged only that their decedent purchased "in or around 1968"— which may mean 1967 or 1969.

In summary, because of possible prejudice to O-A shareholders, because plaintiffs have offered no reasonable explanation for delaying the proposed amendment until two years after they learned the facts which they seek to use to justify the amendment and because the amendment seems futile in that it is inconsistent with plaintiffs' class allegations,[4] the motion to amend is in all respects denied.

#### B. *Motion for Class Action Determination*

Having denied plaintiffs' motion to amend, we must consider whether the existing complaint meets the requirements of a class action. Subparts (a) and (b)(3) of Rule 23, which are set out in the margin,[5] require that plaintiffs

---

4. In view of the disposition we have made of the motion to amend, we have no occasion to consider defendants' other arguments that this case should not proceed as a class action on the basis of the proposed amendment because of asserted conflicts between class members and the failure of plaintiffs to establish that there are any questions of law and fact common to purchasers of A-O and of TIC.

5. The pertinent provisions of Rule 23 are as follows:

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the

show numerosity; the existence of common questions of law or fact; predominance of the common questions; typicality of plaintiffs' claims; the likelihood that plaintiffs will fairly and adequately protect the interests of the class; and superiority of the class action.

■ For the reasons set forth below, we find that plaintiffs have failed to satisfy any of the requirements of Rule 23 other than that of numerosity.[6] The fundamental defect in plaintiffs' allegations is that they have not provided sufficient factual detail to establish that there are any questions of law or fact common to the class. In addition, the requirements of Rule 23, as applied to this case, are so interrelated that in the absence of a showing of common questions, plaintiffs cannot meet the requirements of predominance, typicality, representativeness or superiority.

(1) *Common Questions of Law or Fact*

In support of plaintiffs' claim that there are common questions, paragraphs 15 and 16 of the complaint allege "a course of conduct" from 1962 to 1972 designed to manipulate the market price of TIC common stock and to deceive the public as to the financial and managerial condition of TIC.[7]

Plaintiffs rely on a line of authorities which hold that if the misrepresentations alleged constitute "a common course of conduct," the requirement of common questions may be satisfied. *E. g.,* Green v. Wolf Corp., 406 F.2d 291 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969).

■ According to these cases, the common questions requirement may be met even if the allegedly false statements were made in several documents published over a period of several years and even if the class members purchased at different times in reliance on different documents; it is, however, essential that plaintiff show that there is at least one common strand of misrepresentation running through all of the documents relied upon.

In Green v. Wolf Corp., *supra,* plaintiff defined the class to include all purchasers of the defendant corporation's stock in a single year in which three

---

claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

&ast; &ast; &ast; &ast; &ast;

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

**6.** Plaintiffs' class of 12,000–15,000 members clearly meets the numerosity test. Green v. Wolf Corp., 406 F.2d 291, 298 (2d Cir. 1968). (Class of 2200)

**7.** Most of the allegations hereinafter referred to in connection with the common questions requirement appear to particularize the course of conduct allegations in paragraphs 15 and 16.

In paragraph 6, plaintiffs also make a *pro forma* allegation of "common questions" which does not mention the "course of conduct" theory and is otherwise so general as to be of no assistance in determining whether there are common questions:

" &ast; &ast; &ast; The issues of fact and law common to the class are whether false or fraudulent financial statements were issued, in what respects there were false and fraudulent statements, whether TIC should have been a registered investment company, the legal consequences which flow from the above and the measure of damages."

prospectuses were issued. It was alleged that certain misstatements with respect to the largest and most important item in the financial statements were common to all three prospectuses. In these circumstances, the Court of Appeals for this circuit held that the alleged misrepresentations constituted a "common course of conduct":

> "Moreover, Green argues that Wolf, in making the interrelated misrepresentations in all three prospectuses, engaged in a common course of conduct designed to continually manipulate the market price of Wolf stock." 406 F.2d at 300.

Similarly, in the earlier case of Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909 (9th Cir. 1964) (decided under Rule 23 before its amendment), the court found that " 'all or substantially all' of certain misrepresentations, detailed in the complaint, are alleged to have been made ' * * * to each and all of the plaintiffs and investors.' " 329 F.2d at 914.

Fischer v. Kletz, 41 F.R.D. 377 (S.D. N.Y.1966), was the first case in which this court adopted the approach later to be followed in Green v. Wolf Corp., *supra*. *Fischer* involved misrepresentations in a series of seven financial statements issued over a two-year period, all of which allegedly contained the same distortion, an overstatement of the Yale company's earnings and profits. The class was defined to include all investors who had purchased during the two-year period, 1963–1965. The court accepted plaintiff's argument that the price at which an investor purchased in 1965 might be affected by a misrepresentation in 1963:

> "Like standing dominoes * * * one misrepresentation in a financial statement can cause subsequent statements to fall into inaccuracy and distortion." 41 F.R.D. at 381.

It is true that in the early case of Kronenberg v. Hotel Governor Clinton, 41 F.R.D 42 (S.D.N.Y.1966), this court found common questions apparently without requiring an affirmative showing that specific misrepresentations were common to all documents relied on by class members.

But subsequent cases have confirmed the need for such a showing. In Weiss v. Tenney Corp., 47 F.R.D. 283, 291 (S. D.N.Y.1969), two specific alleged misstatements concerning cash distributions to shareholders and corporate earnings were contained in all financial statements issued over a two-year period. And in Siegel v. Realty Equities Corporation of New York, 54 F.R.D. 420 (S.D.N.Y.1972) the claims of all class members concerned the accuracy of statements as to defendant's financial condition and the results of operations for one year and part of another contained in a series of twelve financial reports issued by defendant over a one-year period.

Morris v. Burchard, 51 F.R.D. 530 (S.D.N.Y.1971) adhered to this standard by holding that plaintiff had not shown the existence of common questions where the alleged misrepresentations were largely oral and apparently varied among class members.

> "The alleged misrepresentations were not standarized; they appear largely to have been a disconnected series of oral statements which must have varied from person to person and seemingly not made [sic] pursuant to a common course of conduct. No one of the variety of misstatements was necessarily brought to the attention of [each shareholder]." 51 F.R.D. at 534.

■ In determining whether plaintiffs have shown the existence of common questions, this court may not inquire into the substantive merits of plaintiffs' allegations. Eisen v. Carlisle & Jacquelin, 479 F.2d 1005, 1015–1016 (2d Cir. 1973) (Eisen III), aff'd 417 U.S. 156, 176–179, 94 S.Ct. 2140, 2152–

2153, 40 L.Ed.2d 732 (1974) (Eisen IV); Brandt v. Owens Illinois, Inc., 62 F.R.D. 160 at 164 (S.D.N.Y.1973)

■ However, in order for plaintiffs to sustain their burden of proof, Green v. Wolf Corp., 406 F.2d 291, 298 (2d Cir. 1968); Free World Foreign Cars, Inc. v. Alfa Romeo, 55 F.R.D. 26, 29 (S.D.N.Y. 1972), that the common questions requirement is satisfied, they must provide detailed, particularized proof of specific fraudulent statements which constitute a common course of conduct. Robinson v. Penn Central Co., 58 F.R.D. 436 at 444 (S.D.N.Y.1973)

If plaintiffs fail to provide copies of the allegedly fraudulent documents or refer to particular statements in documents identified with some precision, it is impossible for the court to ascertain whether a consistent thread of misrepresentation runs through TIC's public statements for the period, 1962–1972, as is required. See cases cited, *supra*.

■ Plaintiffs' allegations and their responses to defendants' requests for detail are not sufficiently particularized to enable us to hold that plaintiffs have satisfied the requirement.

Paragraph 4 of the complaint, in defining the class of investors, refers to their reliance upon "false and fraudulent statements of TIC filed and circulated." In response to defendants' request to specify the documents and statements relied on, plaintiffs could only state generally that the complaint referred to "annual reports, interim reports, proxy statements, 10–K statements, 8–K statements and prospectuses and press releases." Plaintiffs' Answer to Interrogatory 1(d). Moreover, plaintiffs lacked knowledge of any specific statements contained in the unidentified reports. Plaintiffs' Answer to Interrogatory 1(e). When asked to detail the material omissions from such documents, plaintiffs replied in such unresponsive generalities as the following:

"[a]mong other things defendants made false and fraudulent statements, overvalued assets and understated liabilities and losses." Plaintiffs' Answer to Interrogatory 1(f).

Similarly, plaintiffs responded that they could not state the earliest date on which TIC should have been registered under the Investment Company Act because "the facts [were] within the possession of the defendants and [were] the subject of pending discovery." Plaintiffs' Answer to Interrogatory 1(g).

Plaintiffs also refused to detail the "plan, scheme, conspiracy or course of conduct" charged in paragraph 15 on the ground that it would require them to reveal their "conclusions and contentions in point of law." Plaintiffs' Answer to Interrogatory 5(b). This uninformative litany is repeated numerous times in reply to interrogatories concerning virtually every allegation in the complaint.

To summarize the balance of the allegations, plaintiffs claim that from 1962 to 1972, defendants published statements and filed documents with the SEC which presented a falsely favorable impression of TIC's earnings and assets. Complaint, paragraph 16. In addition, certain of TIC's reports to shareholders allegedly represented, contrary to fact, that its future business ventures would be concentrated in real estate and financial enterprises. In other reports, TIC allegedly stated that it would de-emphasize real estate and concentrate on entertainment when, in fact, it was purchasing companies in a variety of different industries. Complaint, paragraph 17.

Paragraphs 20–23 allege that the individual defendants caused TIC to purchase several subsidiaries and circulated promising projections of the growth and income of the subsidiaries knowing that they had made inadequate investigations and that they had failed to disclose the risks. In addition, defendants allegedly concealed problems with the manage-

ment and operations of the newly acquired companies and the fact that certain ones were abandoned or reduced in scope.

In paragraphs 24(a)–(f), plaintiffs allege various misrepresentations in TIC's financial statements from 1962 to 1972, including improper accounting for profits on sales of property and securities of other companies, Paragraph 24(a)–(b), and improper valuation of acquired companies on TIC's balance sheet. Paragraphs 24(d)–(f).

In respect of the majority of these allegations, plaintiff's responses to interrogatories admit that they are unable to identify the documents in which the misstatements were allegedly made or to detail the alleged misrepresentations or omissions. In some instances, plaintiffs identify three or four documents by date, but in no instance were the documents published over the entire ten-year period from 1962–72 during which the class members allegedly purchased.[8] In addition, plaintiffs have failed to submit a single copy of an allegedly fraudulent document; nor have they quoted a single alleged misstatement verbatim. In summary, plaintiffs have offered practically no detail to support their allegations; and such detail as they have provided fails to show that any particular misrepresentation was common to statements published by TIC over the ten-year period, 1962–1972.

Plaintiffs' allegations as to violations of the Investment Company Act in paragraphs 27 and 28 also suffer from lack of particularity. It is charged that "at some point in time after 1962", defendants converted TIC into an investment company which should have been reg-

istered under the Investment Company Act of 1940. The failure to register allegedly subjected the company to possible claims by investors, and the complaint charges that TIC failed to reveal these potential claims in any of its public statements.

Again, however, plaintiffs admit that they cannot state when TIC ceased all functions except those of an investment company or what event caused it to become an investment company. Plaintiffs' Answers to Interrogatories 15(a)-(e).[9]

*Summary*

The defect in plaintiffs' allegations as to a common course of conduct is not, as defendants argue, that a ten-year period is involved. If plaintiffs submitted copies of the allegedly fraudulent documents, specified the statements alleged to be false, and demonstrated that some misrepresentations were common to the period, 1962–72, they would meet the requirements for a finding of common questions.

Furthermore, if plaintiffs could substantiate their charge that TIC should have been registered under the Investment Company Act during some particular period, they could show that this omission was necessarily common to purchasers during that period. Esplin v. Hirschi, 402 F.2d 94 (10th Cir. 1968).

■ Despite plaintiffs' failure up to this point to show common questions, the court is mindful of the Second Circuit's admonition—that district courts should be cautious in denying class action status where to do so would be to sound the death knell of the action. Ei-

---

8. For example plaintiffs state that the alleged misrepresentations as to investments in the entertainment industry were made in three reports to shareholders in 1967 and in the Annual Report of 1971. These alleged misrepresentations could have influenced investors during only five of the ten years from 1962 to 1972. Plaintiffs' Answers to Interrogatories 7(g)–(h).

9. The proxy rule violations and other wrongdoing alleged in connection with the merger of TIC and Omega-Alpha allegedly occurred in and around 1971–1972. These alleged acts could not therefore constitute a common course of conduct over the ten-year period, 1962–1972.

sen v. Carlisle & Jacquelin, 370 F.2d 119, 121 (2d Cir. 1966), cert. denied 386 U.S. 1035, 87 S.Ct. 1487, 18 LL.Ed.2d 598 (1967) (Eisen I). Thus we think the best course of action is to deny plaintiffs' motion without prejudice to its renewal on a showing that plaintiffs will furnish copies of the allegedly false documents and will provide specific facts to support the "common questions" and other class action allegations found to be deficient. Robinson v. Penn Central Co., 58 F.R.D. 436 at 444 (S.D.N.Y.1973).

As noted, the principal reason plaintiffs have been unable to satisfy most of the remaining class action requirements is that they have failed to show the existence of common questions. Although plaintiffs' motion could be denied solely on the basis of the failure to fulfill the common questions requirement, we think it not amiss to comment on the remaining requirements in an attempt to focus the parties' arguments in the event the motion is renewed.

### (2) *Predominance of Common Questions*

If plaintiffs satisfy the requirement of "common questions," it is probable that such questions will be found to predominate over individual issues.

The Advisory Committee has suggested that in a securities fraud case, individual issues may predominate even though there is a common thread of misrepresentation if "there was a material variation * * * in the kinds or degrees of reliance" by class members. Proposed Amendments to the Rules of Civil Procedure, 39 F.R.D. 69, 103 (1966).

In Green v. Wolf Corp., 406 F. 2d 291 (2d Cir. 1968), however, the Second Circuit rejected the argument that the existence of individual issues of reliance alone may disqualify a suit from proceeding as a class action:

"Carried to its logical end, [the argument] would negate any attempted class action under Rule 10b–5, since as the District Courts have recognized, reliance is an issue lurking in every 10b–5 action. [citation omitted]." 406 F.2d at 301.

If need be, there may be separate trials on the issue of reliance. *Id.*; Weiss v. Tenney Corp., 47 F.R.D. 283, 291, 293 (S.D.N.Y.1969). Alternatively, the court may utilize one of the rules or presumptions enumerated in Korn v. Franchard Corp., 456 F.2d 1206, 1212–1213 (2d Cir. 1972) for mitigating the problem of showing reliance: inferring from the materiality of the misstatement that it would have been relied upon by a reasonable investor; or stressing general reliance on a common course of conduct over a period of time.

### (3) *Typicality*

In the circumstances of this case, in order for plaintiffs to show that their claims are typical of the claims of class members generally, they must first establish the existence of common questions. Specifically, in order for plaintiffs to show that the misrepresentations they relied on in 1967–68 are typical of misrepresentations relied on by class members who purchased during the ten-year period, 1962–1972, they must show that the same series of misstatements appeared in TIC's public statements issued throughout the entire ten-year period.

In Green v. Wolf Corp., 406 F.2d 291 (2d Cir. 1968) where plaintiff purchased *after* publication of the last in a series of three prospectuses, all of which allegedly contained the same misrepresentation, the court held that his claims were typical even of those who purchased before the final prospectus:

"Because it appears that the faulted misstatements alleged in the first

two prospectuses are also present in the third prospectus, it would be logical and efficient to permit Green to represent all the purchasers, at least with respect to the common representations." 406 F.2d at 299.

Siegel v. Realty Equities Corp. of New York, CCH Fed.Sec.L.Rep. ¶ 93,356, (S.D.N.Y.1973) at 91,907, presents the opposite situation in that there two allegedly false documents were issued *after* the plaintiff purchased. Nonetheless, the court said that if the misrepresentations were part of a common scheme, plaintiff's claims could be deemed typical of the claims of those who purchased in reliance on the two later documents. *Id.* at 91,907; *see* Burstein v. Slote, 12 F.R.Serv.2d 577, 579 (S.D.N.Y.1968).

*Green, supra,* and *Siegel, supra,* together indicate that if, on renewal of this motion, plaintiffs can show that the same series of misstatements appeared in all documents issued throughout the period, 1962–1972, they will be able to show that their claims are typical of the claims of those who purchased both before and after their own purchases in 1967 and 1968.

### (4) *Fair and Adequate Representation of the Interests of Class Members*

 To fulfill the requirement of Rule 23(a) that plaintiffs will fairly and adequately protect the interests of the class, plaintiffs must show that there are no conflicts between the interest of plaintiffs and class members or between the interests of different groups of class members. Herbst v. Able, 47 F.R.D. 11, 15 (S.D.N.Y.1969).

In the case at bar, investors who purchased and sold in the early part of the ten-year period, 1962–1972, have an interest in emphasizing the significance of misrepresentations that preceded their purchases and in showing that the misstatements had ceased to inflate market

prices before they sold. Plaintiffs and other investors who bought late in the period are interested in emphasizing the effect of misrepresentations late in the period, just prior to their purchases. Plaintiffs' interests may thus be antagonistic to those of class members who purchased early in the period and sold at around the time plaintiffs were purchasing their stock. *See,* Robinson v. Penn Central Company, 58 F.R.D. 436 at 444 (S.D.N.Y.1973).

This problem may be mitigated by the use of sub-classes; however, the parties will have an opportunity to argue the issue further should plaintiffs renew their motion.

### (5) *Superiority of the Class Action*

 The most important factor in determining whether the class action is superior to other available procedures is the number of persons injured by the alleged violation of 10b–5. Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968). This criterion is clearly satisfied since the class here proposed is larger than the 2,200 member class in *Green.*

The Second Circuit has also directed us to consider whether in the absence of a class action, no single claimant's stake would be large enough to justify maintaining the suit. Korn v. Franchard Corp., 456 F.2d 1206, 1214 (2d Cir. 1972); Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 566–567 (2d Cir. 1968) (Eisen II). Unfortunately, plaintiffs have not furnished sufficient information as to the damages claimed to enable us to apply this criterion.

Finally, on renewal of this motion, plaintiffs should attempt to establish that the proposed class action is manageable in terms of the feasibility of giving notice to class members and the likelihood of avoiding separate trials on most of the important issues in the case. Siegel v. Realty Equities Corp. of New

York, CCH Fed.Sec.L.Rep. ¶ 93,356 (S.D. N.Y.1973) at 91,908.

With respect to notice, Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974) (Eisen IV) held that notice to class members who can be identified is mandatory under Rule 23(b)(3) and that the class action plaintiff must bear the cost of such notice. In the case at bar, plaintiffs have stated that most class members can be identified. Affidavit of Irving Bizar, sworn to October 16, 1973. On renewal of this motion, plaintiffs must assure the court that they are willing and able to bear the expense of notice.[10]

If plaintiffs can submit particularized proof of a common course of misrepresentation, (as they must to satisfy the common questions requirement) separate trials can probably be avoided on the issues of the existence and materiality of the alleged misrepresentations. The reliance of each class member may then be the only issue on which separate trials are necessary, and the class action will clearly be the superior method of adjudicating the remaining issues.

C. *Summary*

In summary, both of plaintiffs' motions are denied, without prejudice to renewal of the class action motion alone. With respect to the issues raised on the class action motion, plaintiffs have met the numerosity test, but a determination of the other issues must await submission of detailed proof, including copies of relevant documents, on the issue of common questions of law or fact. Plaintiffs are allowed 30 days to submit such proof and to assure the court that they are willing to pay the expense of notifying identifiable class members.

So ordered.

10. It is to be noted that the cost of notifying the 12,000--15,000 class members in the instant case may not be prohibitive as in *Ei-*

*sen* where the class numbered more than six million.