In re MUTUAL SAVINGS BANK
SECURITIES LITIGATION.

No. 95–CV–71590.

United States District Court,
E.D. Michigan,
Southern Division.

May 9, 1996.

Elwood S. Simon, John P. Zuccarini, Michael G. Wassmann, Elwood S. Simon & Associates, Birmingham, MI, Bruce E. Gerstein, Barry Taus, Garwin, Bronzaft, Gerstein & Fisher, New York City, for plaintiff.

Thomas J. Tallerico, Howard & Howard, Bloomfield Hills, MI, for Defendant Mutual Savings Bank.

Allan Horwich, Schiff, Hardin & Waite, Chicago, IL, for Co–Counsel, for all Defendants.

## OPINION AND ORDER

FEIKENS, District Judge.

### I. INTRODUCTION

This action has been brought to address alleged fraudulent conduct, on behalf of Defendant Mutual Savings Bank, f.s.b. ("Mutual" or "the Bank"), a federally chartered stock savings bank headquartered in Bay City, Michigan, by certain of its former and/or current officers and directors ("the Individual Defendants"), in violation of: Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and § 78t(a); Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission ("the SEC"), 17 C.F.R. § 240.10b–5; and the common law.

The First Amended and Consolidated Complaint names E. Richard Schwabach ("Schwabach"), Peter J. Dee ("Dee"), and Bruce Cohen ("Cohen") as Plaintiffs, who claim that they were harmed by the alleged fraud when they bought stock in Mutual at artificially inflated prices.[1] They have moved to certify a class ("the Proposed Class") consisting of all persons who bought Mutual common stock between November 30, 1993 and November 14, 1994 ("the Proposed Class Period").[2] Defendants oppose certification of the Proposed Class.

### II. FIRST AMENDED AND CONSOLIDATED COMPLAINT—SUBSTANTIVE ALLEGATIONS

Plaintiffs allege that Defendants, through a series of filings with the Office of Thrift Supervision ("the OTS") and the SEC, press releases, reports, and other public statements, misrepresented that Mutual was embarking on a conservative business course designed to reduce the sensitivity of the Bank's investments to high interest rates and return the Bank to its historic role as a mortgage lender. In the 1980's, the Bank's management had departed from Mutual's traditional business practices and had invested primarily in high risk, interest rate sensitive securities rather than focusing on retail banking and mortgage originations. At this time, the Bank sold interest rate futures contracts and entered into a series of interest rate swaps as a "hedge" against interest rate fluctuations; the hedge proved to be costly. As a result, the Bank was subjected to heightened regulatory scrutiny and the Bank acquired new management (including many of the Individual Defendants) recommended and approved by the OTS in September, 1990.

After the turnover in management, Defendants sought to assure the public that the abuses of the past would be corrected by new management's strategy to reduce interest rate risk and return the Bank to its traditional role as a single-family home lending institution. See May 13, 1992 Offering Circular at 4 and 1992 Annual Report at 2 and 8. To that end, by October of 1993, the Bank had retired all of its interest futures contracts but was financially unable to extinguish all of the interest rate swaps acquired by prior management. In October of 1993, the Defendants announced a rights offering, pursuant to which each shareholder of record would receive one "right" to purchase an additional share of common stock, at $17.25, if the offering was fully subscribed, for every

---

1. Plaintiffs invoke the theory of "fraud on the market," which holds that in an efficient market, public misrepresentations are reflected in a market price which is higher or lower than it would be absent the fraud (i.e., the price is artificially inflated). Basic, Inc. v. Levinson, 485 U.S. 224, 248 n. 27, 108 S.Ct. 978, n. 27, 99 L.Ed.2d 194 (1987).

All of the named Plaintiffs allegedly purchased Mutual stock sometime between November 30, 1993 and November 14, 1994, inclusive. Schwabach purchased 200 shares in December of 1993 at $18.50 per share and 200 more on April 29, 1994, at $10.50 per share. Dee purchased 1000 shares on August 29, 1994 at $6.00 per share and

1000 shares on September 8, 1994 at $7.25 per share. Cohen bought 4000 shares on August 29, 1994 at $6.00 per share, 4000 shares at $4.25 per share on November 2, 1994, and 2000 shares on November 8, 1994, at $7.25 per share. The pleadings do not indicate if and when Plaintiffs sold their stock.

2. An offering was announced on October 27, 1993. On the closing date of the offering, November 30, 1993 (the starting date of the Proposed Class Period), Mutual common stock was trading at $18.25 per share. On November 14, 1994 (the closing date of the Proposed Class Period), Mutual common stock was trading at as low as $4.25 per share.

two shares held. The October 27, 1993 Offering Circular, at 3, indicates that the purpose of the rights offering was to "provide Mutual with sufficient capital so that it is able to absorb the losses created by [the interest rate swaps and the amortization of deferred hedge losses], thereby positioning Mutual for enhanced profitability and for future growth and expansion." In that Circular, the Defendants again indicated that the objective of the Bank was to move to a conservative investment strategy whereby the maturities of assets and liabilities would be matched,[3] and that management now believed, due to the shortening of asset maturities and the increased levels of adjustable rate assets, that interest rate volatility could be prudently managed without using interest rate swaps. As the rights offering closed, on November 30, 1993, through a press release, one of the Individual Defendants allegedly indicated that the offering had been successful and the remaining interest rate swaps and speculative hedge losses had been eliminated, and that Mutual was looking toward future growth as a result of replacing "artificial hedges" with "natural" ones.[4] In its 1993 Annual Report, filed on or about March 23, 1994, and an accompanying letter to shareholders, and in an April 20, 1994 press release, management indicated that it had implemented the objectives stated in its 1992 and 1993 Offering Circulars by: opening new loan production offices and increasing income flowing from loan originations; and investing in mortgage-backed securities having adjustable rate features or fixed rates with maturities of fifteen years or less, and simultaneously lengthening the duration of borrowings.

Plaintiffs allege that Defendants' representations, summarized above, were fraudulent because they omitted facts which, if known, would have alerted the market to the fact that the Bank was actually following a highly speculative investment strategy that subjected the Bank to significant losses in the event that interest rates changed. Specifically, Plaintiffs allege that Defendants' representation that interest rate volatility was being prudently managed was rendered misleading by: Defendants' failure to reveal that, because approximately sixty-five percent of the Bank's investment portfolio was concentrated in mortgage backed securities,[5] it would be impossible to match the maturities of the Bank's assets with the maturities of its liabilities if interest rates should rise; and by Defendants' failure to disclose that the Bank had purchased an illiquid, high risk $40 million five year Federal Home Loan Bank ("FHLB") debenture during the first quarter of 1994. Plaintiffs further allege that when interest rates did rise in 1994, Defendants masked the fact that their strategy to reduce interest rate sensitivity was not working by using an accounting classification that would cause the book value of the Bank's assets to be equivalent to the original cost of purchase rather than the lower fair market value. This accounting maneuver also allegedly locked up the Bank's assets in the mortgage backed securities, which in a rising interest rate environment, defeated Defendants' attempts to control interest rate risk. Defendants did disclose that they had reclassified Mutual's assets in the Bank's 1994 First Quarter Form 10-Q, issued on or about May 16, 1994; however, Plaintiffs allege that because the Form 10-Q failed to advise of the

---

3. The Circular indicates that the Bank had been plagued by an excess of long-term investments financed by short-term liabilities, which proved costly, as the Bank had to replace its financing more quickly than its assets. The excess of liabilities over assets that are currently maturing is called a "negative interest rate gap."

4. The term, "artificial hedges" refers to the interest rate swaps and the effects of amortization of the deferred hedge losses on the interest rate futures contracts and swaps that were settled in 1992, and "natural hedges" refers to efforts to match up the maturities of Mutual's liabilities with those of its assets.

5. Plaintiffs explain in their First Amended and Consolidated Complaint that the expected life of a mortgage backed security (or bond) is calculated based on assumptions as to when the underlying mortgages will be paid and the bond will mature. This means that the expected period of maturity can lengthen as interest rates rise. In that scenario, the Bank could not successfully match the durations of liabilities with those of assets, creating a "negative interest rate gap" (*i.e.*, more liabilities than assets are currently maturing).

effects of the reclassification, it was itself fraudulently misleading. Defendants allegedly committed fraud by failing to reveal, until the Bank's 1994 Third Quarter Form 10–Q was issued on the closing date of the Proposed Class Period, that the Bank either would have to decrease its capital or face continued interest rate sensitivity and thus could not simultaneously obtain both of its stated goals of increasing capital and reducing interest rate risk.

Finally, Plaintiffs allege that the Defendants misrepresented the strength of the Bank's loan origination business in the Bank's 1993 Annual Report and in the press release issued April 20, 1994, when they failed to disclose that the Bank's loan production offices were in jeopardy; it was not until three weeks after the press release that Defendants disclosed that eleven of the Bank's twelve loan production offices would be closed. On or about May 16, 1994, in the First Quarter Form 10–Q, Defendants disclosed that the loan production offices were being closed in response to a decrease in loan demand. In addition, Plaintiffs allege that in early 1994, Defendants failed to disclose that the Bank had begun to sell its loan servicing contracts of loans that it had originated. Selling the contracts and closing the loan production offices, Plaintiffs allege, helped Defendants to effectively conceal that their investment strategy was not working by making short term funds available at the expense of the Bank's future operations.

### III. LAW AND ANALYSIS

■ FED.R.CIV.P. 23 frames the analysis for a motion for class certification. Rule 23 provides, in relevant part:

(a) **Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) **Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

. . . . .

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

The party seeking class certification has the burden of showing that all the prerequisites of subsection (a) of Rule 23 are met, and that the case falls within a subcategory of 23(b) (in this case, Plaintiffs have chosen 23(b)(3)). *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1079 (6th Cir.1996).

■ Plaintiffs trace through each of the requirements listed in Rule 23(a) and argue that each has been met in turn. Clearly, the numerosity requirement of Rule 23(a)(1) is satisfied, as millions of shares of Mutual stock were outstanding and traded during the Proposed Class Period. Defendants do not dispute the existence of numerosity. It would also seem that there are questions of law and fact common to the class, as required by part (a)(2) of Rule 23. Although the market was subjected to different public statements made by Defendants throughout the Proposed Class Period, Plaintiffs allege that throughout the entire class period, the Defendants persisted in omitting to inform the market that their conservative investment strategy, which consisted of matching asset and liability durations, could not work in a rising interest rate environment. This

information was allegedly omitted to create the impression that the Bank was financially healthy. Taking the Plaintiffs' substantive allegations as true, as is proper at this stage of the proceedings,[6] *Shelter Realty Corp. v. Allied Maintenance Corp.*, 574 F.2d 656, 661 n. 15 (2d Cir.1978); *Blackie v. Barrack*, 524 F.2d 891, 901 (1975); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1973) (stating that Rule 23 does not give a court authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it is maintainable as a class action), it is clear that common questions exist, including: whether Defendants' failure to note that the success of its strategy to align the maturities of assets with liabilities was contingent on interest rates not rising constitutes an actionable misrepresentation; whether the information was purposely or recklessly omitted; and whether the misrepresentation, if any, was material.[7]

■ I turn now to the third and fourth prerequisites for class action certification, typicality and adequacy of representation. The two concepts are related, for if a class representative is not typical of other members of the class, he or she can not be an adequate representative. *Ballan v. Upjohn*, 159 F.R.D. 473, 484 (W.D.Mich.1994). Typicality requires that a plaintiff's claim " 'arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and [that it is] based on the same legal theory.' " *In re American Medical*, 75 F.3d at 1082, quoting 1 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS, § 3–13, at 3–76 (3d ed. 1992). Adequate representation requires: 1) that the representatives share common interests with unnamed class members, and 2) an appearance that the representatives will vigorously prosecute class interests through qualified counsel.[8] *Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir.1976). Typicality merges somewhat with the first part of the test for adequate representation because "in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *In re American Medical*, 75 F.3d at 1083. The adequacy of representation requirement "also raises concerns about the competency of class counsel and conflicts of interest." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157–158, n. 13, 102 S.Ct. 2364, 2371 n. 13, 72 L.Ed.2d 740 (1981).

■ Defendants initially argued that curative disclosures were made in an April 20, 1994 press release and that the class period should therefore terminate on that date. After an initial hearing, the Defendants argued that the class period should terminate no later than May 16, 1994 because all previously omitted facts were certainly disclosed by then. Plaintiffs counter that Defendants are asking the court to decide, on the merits,

---

**6.** However, this does not preclude my taking notice of the facts of the case, like drops in stock price, if that is needed, for "[m]aintainability may be determined by the court on the basis of the pleadings if sufficient facts are set forth, but ordinarily the determination should be predicated on more information than the pleadings will provide.... The parties should be afforded an opportunity to present evidence on the maintainability of a class action." *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir.1974).

**7.** To make out a violation of Rule 10b–5, a plaintiff needs to establish the following elements: (a) a misrepresentation or omission by the defendant; (b) that the misrepresentation or omission related to a material fact; (c) a purchase or sale of a security in connection with the fraudulent device; (d) scienter on the part of the defendant; (e) justifiable reliance by the plaintiff on the defendant's statements, or fraud on the market;

and (f) damages resulting from the misrepresentation or omission. *See, e.g., Cione v. Gorr*, 843 F.Supp. 1199, 1201–02 (N.D.Ohio 1994) (citing *Platsis v. E.F. Hutton & Co.*, 946 F.2d 38, 40 (6th Cir.1991), *cert. denied*, 503 U.S. 984, 112 S.Ct. 1669, 118 L.Ed.2d 389 (1992)). Further, to invoke a presumption of reliance by using what is known as the "fraud on the market theory", a plaintiff must also allege that the misrepresentations were public, that the shares were traded on an efficient market, and that shares were traded between the time the misrepresentations were made and the time the truth was revealed. *Basic, Inc. v. Levinson*, 485 U.S. 224, 248 n. 27, 108 S.Ct. 978, 99 L.Ed.2d 194 (1987).

**8.** The Defendants have not disputed that Plaintiffs' counsel, experienced securities litigators, are competent, and that facet of the test for adequate representation appears to have been met.

whether the disclosure made in May of 1994 was adequate, and that this is improper.

I do not decide, at this stage, whether the disclosures that were made in the spring of 1994 were curative; however, for purposes of deciding the class certification issue, I must consider Defendants' arguments that typicality and adequacy of representation are destroyed by the existence of at least partial disclosure in May of 1994. Restating the argument, a class member who purchased stock in the Bank prior to April 20, 1994 is not in the same position as one who purchased between April 20 and May 16, 1994, and neither is in the same position as one who purchased shares after May 16. This is so because each buyer, and the market itself, had different information during each of these periods of time.

I do not believe the motion should be defeated for lack of typicality. Plaintiffs have alleged that each of the public statements made by the Bank over the course of the Proposed Class Period were part of a common course of fraudulent conduct. Since it appears from the First Amended and Consolidated Complaint that this case involves a common course of conduct over the entire Proposed Class Period, at this time it sufficiently appears that the questions common to all the members of the Proposed Class will be "relatively substantial ... [and] Rule 23(a)(3) 'does not require that all the members of the class be identically situated, if there are substantial questions either of law or fact common to all.'" *Mader v. Armel*, 402 F.2d 158, 161–62 (6th Cir.1968) (quoting

*Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 914 (9th Cir.1964)). However, I reserve the right to alter this decision if at a later date it appears that Plaintiffs will be unable to substantiate their claims that Defendants consistently omitted the same information from their statements about the Bank's operations throughout the entire Proposed Class Period.[9]

▮ Defendants have a stronger argument that the claims of those who purchased and sold before curative information was disclosed are antagonistic to the claims of those who bought later because the former have an incentive to argue that the inflation was dissipated early on when they sold and the latter have an incentive to argue the opposite.[10] I consider this conflicts argument as an issue addressed properly under Rule 23(a)(4)'s adequate representation requirement.

This is not a new problem, as Defendants recognize by advocating Judge Walker's analysis in *In re Seagate Technology II Securities Litigation*, 843 F.Supp. 1341 (N.D.Cal. 1994). That opinion explicitly departed with the position, taken by various other courts that had faced the "early seller/later purchaser" conflict, that a plaintiff class should be certified notwithstanding. *Seagate II*, 843 F.Supp. at 1359 (citing *Blackie v. Barrack*, 524 F.2d 891, 908 (9th Cir.1975); *In re LTV Securities Litigation*, 88 F.R.D. 134, 149 (N.D.Tex.1980); *Koenig v. Smith*, 88 F.R.D. 604, 607–08 (E.D.N.Y.1980); *Tucker v. Arthur Andersen & Co.*, 67 F.R.D. 468, 482

---

9. I note that Fᴇᴅ.R.Cɪᴠ.P. 23(c)(1) provides that an order to certify a class "may be conditional, and may be altered or amended before the decision on the merits."

10. This is a consequence of the "out of pocket" damages rule, which is often used to compute investors' damages awards in class action securities cases. To compute out of pocket damages requires determining how much inflation was present in the price of the stock at the time of purchase (the difference between the purchase price and the true value of the stock, or the price that the stock would have been assigned by the market if there had been no fraud, at the time of purchase). For those members of the class who held their shares throughout the entire class period, no further computation is needed. For those who sold prior to the end of the class period, the

amount of inflation present in the price received at the time of sale must be subtracted out of the damages at purchase calculation. *See* Judge Sneed's concurring opinion in *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1341 (9th Cir.1976) for a fuller explanation of this damages calculation.

It follows that those class members who sold their shares on day X during the class period will want to argue that the amount of price inflation existing on day X is minimal, while those who purchased their shares on day X will have an incentive to argue that the price inflation on day X is quite great. Thus, a potential conflict arises between members of the class, opening to question whether any one class representative can adequately represent both those who sold and purchased on day X.

(S.D.N.Y.1975); *Feldman v. Lifton,* 64 F.R.D. 539, 549 (S.D.N.Y.1974); *Greene v. Emersons Ltd.,* 86 F.R.D. 47, 61 (S.D.N.Y. 1980); *Simon v. Westinghouse Electric Corp.,* 73 F.R.D. 480, 484 (E.D.Pa.1977); *B & B Investment Club v. Kleinert's, Inc.,* 62 F.R.D. 140, 144 (E.D.Pa.1974); *In re Unioil Securities Litigation,* 107 F.R.D. 615, 622 (C.D.Cal.1985); *In re AM International, Inc., Securities Litigation,* 108 F.R.D. 190, 196 (S.D.N.Y.1985); *Seidman v. Stauffer Chemical Corp.,* [1986–1987] Fed.Sec.L.Rep. ¶ 92,868 at 94,233, 1986 WL 9803 (D.Conn. 1986). Most of these cases, Judge Walker noted, suggested using subclasses to address the seller-purchaser conflict. *Seagate II,* 843 F.Supp. at 1361. Judge Walker dismissed the idea of subclasses, finding them unmanageable; ultimately, a class was certified that excluded those investors who had sold their shares sometime during the class period.

Judge Walker's departure from the approaches taken by previous courts was the product of his disagreement with two propositions that had been accepted by many of these courts. First, he criticized decisions, such as *Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975), that implied that conflicts between sellers and purchasers over price inflation, in a fraud on the market case, essentially involve a question of damages, most often a peripheral issue insufficient to defeat a motion for class certification. *See Seagate II,* 843 F.Supp. at 1358. Judge Walker was of the view that price inflation, "the linchpin" of Rule 10b–5 cases, bears substantially on liability issues such as reliance, materiality, and proximate causation, *Seagate II,* 843 F.Supp. at 1357, and that therefore conflicts between class members regarding the amount of price inflation present on a given day went to the "heart of the case." *Seagate II,* 843 F.Supp. at 1358. Second, he was not convinced that devices such as subclassing and econometric analysis were workable solutions. *Seagate II,* 843 F.Supp. at 1359–62.

Since *Seagate II* has been decided, a number of district court opinions, many unpublished, relating to intraclass conflicts have issued. These courts, by and large, have declined to follow *Seagate II* and instead, like the case's predecessors, have decided to certify plaintiff classes that include both investors who sold their shares prior to the end of the class period ("sellers") and those who did not so sell their shares ("holders"). *In re Intelligent Electronics, Inc., Securities Litigation,* 1996 WL 67622, *4 (E.D.Pa.) (indicating denial of class certification based on purely theoretical conflicts is not warranted); *Freedman v. Louisiana–Pacific Corp.,* 922 F.Supp. 377, 400–02 (D.Oregon 1996) (indicating that the weight of precedent favors class certification); *In re Regal Communications Corp. Securities Litigation,* Fed.Sec. L.Rep. ¶ 98,871, 1995 WL 550454, *8 (E.D.Pa.1995) ("contrary to *Seagate II,* it is the existence and materiality of a misstatement or omission that is central, and from it, price inflation and reliance are presumed"); *Welling v. Alexy,* 155 F.R.D. 654, 662 (N.D.Cal.1994) ("[w]e altogether disagree . . . that such potential conflicts afford a valid reason at this time for refusing to certify a class"); *In re AST Research Securities Litigation,* Fed.Sec.L.Rep. ¶ 98,466, 1994 WL 722888, *4 (C.D.Cal.1994) ("[a]ny conflicting interests in trading fluctuations in inflation during the class period are secondary"); *Yamner v. Boich,* Fed.Sec.L.Rep. ¶ 98,427, 1994 WL 514035, *8 (N.D.Cal.1994) (disagreeing with the view expressed in *Seagate II* that conflicts over price inflation are essentially conflicts over liability issues such as materiality); *In re Scorpion Technologies,* Fed.Sec.L.Rep. ¶ 98,600, 1994 WL 774029, *4 (N.D.Cal.1994); *but see Ziemack v. Centel Corp.,* 163 F.R.D. 530, 541 (N.D.Ill.1995) (indicating that price inflation conflict goes to liability issue of materiality); *Ballan,* 159 F.R.D. at 484 (indicating that class conflict goes beyond damages issue).

I find myself in agreement with the courts that have declined to follow *Seagate II,* although I do believe the opinion has merit inasmuch as it calls attention to the problem of the seller-holder conflict. However, I do not believe the solution is to deny or severely limit certification or to conduct an evidentiary hearing on the composition of the class, as Judge Walker suggested. Contrary to the position taken in *Seagate II,* for the reasons

set forth below, I believe that subclassing [11] is manageable and will minimize conflicts between subclass members to the extent that the adequate representation prong of Rule 23 can be satisfied.

In the first place, I note that to deny sellers participation in the class, as Defendants suggest as an alternative to refusing certification, would be an overinclusive solution to the seller-purchaser conflict. A seller is not in conflict with all holders, but only with those holders who purchased their stock at or after the time of the sale. *Koenig*, 88 F.R.D. at 609 (E.D.N.Y.1980).

Second, I agree with the many courts that have concluded that subclassing is an adequate remedy to the problem of intraclass conflicts. *See, e.g., Blackie*, 524 F.2d at 911; *AM International*, 108 F.R.D. at 193 n. 5; *Koenig*, 88 F.R.D. at 610; *LTV*, 88 F.R.D. at 149; *Intelligent Electronics*, 1996 WL at *5; *Scorpion Technologies*, 1994 WL at *5. This solution was rejected in *Seagate II* because the court recognized the potential for intra-subclass conflict among those who sold their shares on day X and those who purchased on day X and held their shares; thus, the court concluded, infinite subclasses would be required, and this, of course was not feasible. *See Seagate II*, 843 F.Supp. at 1362. While I agree that subclassing may not completely eliminate the seller-purchaser conflict, I believe, in a case such as this one, it can be used to minimize the problem to a tolerable level. As was recognized in *Seagate II* itself, 843 F.Supp. at 1365, in a partial disclosure case, "the level of inflation remains more or less constant" from disclosure to disclosure. Theoretically, then, in the absence of being able to show an intervening partial disclosure, a Plaintiff who buys and sells within a subclass will be constrained from arguing that the price inflation significantly decreased from the date of purchase to the date of sale.

I turn to a determination whether Plaintiffs have shown that common issues predominate over individual issues and that the class action is superior to other available methods for the fair and efficient adjudication of the controversy, as required by Rule 23(b)(3). I find that this requirement is easily satisfied because the advent of the fraud on the market theory essentially transformed "reliance" into a common question. Although different class members may be concerned with proving the materiality of different misstatements, depending on their dates of purchase, in a case such as this one, where the alleged omission of information persisted throughout the class period, all class members will have a strong interest in showing that this omission was material. *Blackie*, 524 F.2d at 909–910. Any other seemingly individual questions as to the materiality of a given disclosure become common ones when subclasses are employed. Thus, the class action appears to be superior to other methods of adjudication when subclassing is used.

All that remains to be considered is Defendants' argument that the class period should terminate no later than May 16, 1994 because fully curative disclosure had occurred by then. At this point in the proceedings, there appears to be a question of fact whether the disclosures culminating on May 16, 1994 were adequate. It may be that when further attention is given to the merits, I will determine that the class period should be abbreviated because no reasonable investor could have been deceived after May 16. For now, I will certify the Proposed Class Period in its entirety, with subclasses created around the dates of apparently significant disclosures, April 20, 1994 (press release) and May 16, 1994 (first quarter Form 10–Q). I note that Plaintiffs will need to find a suitable class representative for the subclass that begins on April 20, as none of the proffered representatives qualify.

## IV. CONCLUSION

Thus, pursuant to FED.R.CIV.P. 23(c)(1), I certify the following Proposed Class, on the condition that Plaintiffs find a class representative who purchased stock between April 20 and May 15, 1994:

11. FED.R.CIV.P. 23(c)(4) provides that "[w]hen appropriate ... a class may be divided into subclasses and each subclass treated as a class."

all persons or entities who purchased Mutual Savings Bank, f.s.b. common stock during the period of November 30, 1993, through and including November 14, 1994, excluding Defendants, members of the immediate families of any Individual Defendant, any entity in which any Defendant has a controlling interest, and the legal representatives, affiliates, heirs, successors, predecessors in interest, or assigns of any Defendant, on condition that subclasses are created for the periods of: November 30, 1993 through April 19, 1994, inclusive; April 20, 1994 through May 15, 1994, inclusive; and May 16, 1994 through November 14, 1994, inclusive.

If it should appear at a later date, upon consideration of the merits, that the Class Period or the subclass structure needs to be modified in any way, I reserve the right to so modify it, pursuant to FED.R.CIV.P. 23.

IT IS SO ORDERED.

